[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 07, 2003
THOMAS  K. KAHN
CLERK

No. 02-13676
Non-Argument Calendar

D.C. Docket No. 00-03359-CV-DMM

GUYANA TELEPHONE & TELEGRAPH CO., LTD.,
a Guyanese Corporation,

Plaintiff-Appellant,

versus

MELBOURNE INTERNATIONAL COMMUNICATIONS, LTD.,
a Florida Limited Partnership,
WAJAY INVESTMENTS, INC.,
a Florida Corporation,
NACS COMMUNICATIONS, INC.,
a Florida Corporation,
CHILESAT, S.A.,
a Chilean Corporation

Defendants-Appellees,

Appeal from the United States District Court for the
Southern District of Florida

**(May 7, 2003)**

Before BLACK, MARCUS and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

Plaintiff-appellant Guyana Telephone and Telegraph Company ("GT&T") appeals the district court's dismissal of its claims under the Florida Deceptive and Unfair Trade Practices Act. It also appeals the district court's denial of its Rule 50(b) motion for judgment as a matter of law on the amounts of (1) compensatory damages and (2) its restitution claim.

I.    BACKGROUND

GT&T is a Guyanese corporation with a monopoly over the local phone network in the Republic of Guyana. In 1993, GT&T entered into agreements with AT&T and MCI to provide international-long-distance service between the United States and Guyana. At all relevant times, AT&T and MCI were the only two companies that could transfer U.S. calls to Guyana. Under separate agreements to provide long-distance service from the United States to Guyana, MCI and AT&T agreed to pay GT&T $0.85 per minute for calls to Guyana that had originated in the United States.[1] These $0.85-per-minute charges are called "termination payments."

---

[1] As described below, this case deals specifically with GT&T's contract with MCI. The contract between GT&T and AT&T is only relevant in helping to establish the market price for calls from the United States to Guyana.

Sometime before 1996, the year when the causative events occurred, GT&T began encouraging "audiotext" providers to route their phone traffic though Guyana. Audiotext providers are generally telephone companies that handle phone traffic with content "of an adult nature." Often these audiotext calls would originate in the United States, be sent to Guyana, and then be sent back to U.S. consumers. This practice allowed GT&T to collect the $0.85-per-minute termination payment from MCI. The benefit for the audiotext companies was that, in exchange for routing phone traffic through Guyana, GT&T would pay them a percentage of the MCI termination payment. Depending on the contract terms with each audiotext company, GT&T would kick back between $0.40 and $0.525 per minute for audiotext calls. In 1996, audiotext calls produced approximately seventy-five percent of GT&T's revenue from U.S. termination payments.

GT&T's claims arose from a scheme that deprived GT&T of termination fees that it would have received from MCI. GT&T alleged that the scheme involved four defendants: (1) Melbourne, a Florida communications company that obtained calls from various U.S. carriers for delivery to a number of places in the Western hemisphere; (2) Wajay, Melbourne's general partner; (3) NACS, Melbourne's limited partner; and (4) Chilesat, a provider of international-long-distance service for calls originating in Chile.

Under the defendants' plan, Melbourne solicited other U.S. communications carriers by offering low rates for calls to Guyana and then entered into agreements with these companies. In August and September of 1996, Melbourne received and aggregated these Guyana-bound calls at its facility in Florida and then used telephone circuits owned by Chilesat to transfer the calls from Florida to MCI's international switching center in New Jersey. This scheme made it appear as if the calls had originated in Chile rather than in the U.S.; thus, the contract between MCI and GT&T did not seem to apply.

MCI normally would have refused to send Chilesat's calls to Guyana unless Chilesat had paid termination payments to MCI for the benefit of GT&T. Chilesat circumvented this problem by misrepresenting to MCI that it had a "direct accounting" relationship with GT&T. As a result, MCI did not collect termination charges from Chilesat because it believed that Chilesat was paying termination charges directly to GT&T. Therefore, because MCI believed these calls originated in Chile and because Chilesat dishonestly convinced MCI that it was paying GT&T's termination charges, MCI sent over one million minutes of U.S.-originated calls to Guyana without obtaining payment for GT&T.[2] If GT&T had received $0.85 per

_____

[2] There was evidence supporting three possible calculations of the number of minutes that MCI routed to Guyana without paying termination charges: 1,169,166; 1,238,377; and 1,298,000.

4

minute for all of these calls, it would have received almost $1 million in termination charges from MCI.

GT&T brought its claims under civil RICO, unjust enrichment,[3] tortious interference with contract, civil conspiracy, and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA" or the "Act"). It also sought punitive damages. The court entered a default judgment on liability as to all claims against Chilesat, except for the FDUTPA claim. The court dismissed the FDUTPA claims as to all defendants when it granted the defendants' Rule 50 motion at the close of evidence, reasoning that the FDUTPA claims were improper because GT&T was not a "consumer" under the meaning of the Act. On the claims that were permitted to proceed, the jury found Melbourne and Wajay liable for unjust enrichment and civil conspiracy.

---

[3] GT&T asserts that its right to restitution arises from an unjust enrichment. This is not quite accurate. The fact that it would be "unjust" (as in "unfair") for a defendant to retain a benefit obtained through the commission of wrong does not mean that the basis of the restitutionary obligation arises from an unjust enrichment. "Liability in unjust enrichment has in principle nothing to do with fault. It has to do with wealth being in one person's hands when it should be in another person's." Peter Birks, Unjust Enrichment and Wrongful Enrichment, 79 Texas L. Rev. 1767, 1789 (2001). The paradigm examples of unjust enrichment are mistaken transfers. "As soon as [a] claimant relies on a wrong [to supply the unjust factor], the right on which he relies arises from that wrong, not from unjust enrichment." Id. at 1783. Here, because GT&T's right to restitution arises from the wrong of the tort committed by the conspiracy, this is a case of wrongful enrichment rather than unjust enrichment: the breach of a primary tort duty gave rise to a secondary right to restitution for the benefit obtained through commission of the wrong. We treat GT&T's references to "unjust enrichment" as requests for restitution, understanding that the defendants' wrong is the basis for the obligation.

As for damages, the jury found Melbourne liable for $263,155 plus prejudgment interest on the unjust-enrichment claim. Notably, it used compensatory damages (rather than restitution) as the measure of recovery. On the civil-conspiracy claims, the jury awarded (1) compensatory damages of $263,155 plus prejudgment interest and (2) $100,000 in punitive damages against both Melbourne and Wajay. The court used the jury's compensatory-damages calculation when it assessed the default judgments against Chilesat. Pursuant to 28 U.S.C. § 1964(c), the court trebled the compensatory damages against Chilesat on the civil RICO claim, for a total award on this claim of $789,465 plus prejudgment interest. It also entered default judgment against Chilesat in the amount of $263,155 plus prejudgment interest on the tortious-interference claim. In addition, the jury leveled punitive damages of $726,310 against Chilesat on the civil-conspiracy claim.

GT&T appeals three issues. First, GT&T contends that the district court erred in granting the defendants' Rule 50 motion to dismiss GT&T's FDUTPA claims. GT&T argues that it was a "consumer" under the meaning of FDUTPA as it stood in 1996 and, alternatively, that the district court should have applied the statute's 2001 amendments retroactively. Second, GT&T maintains that the district court erred in refusing to grant its Rule 50(b) motion for judgment as a matter of law on the amount of its compensatory damages. GT&T contends that because the defendants deprived

6

it of at least 1,169,166 minutes of calls at $0.85 per minute, the evidence would have compelled a reasonable jury to find damages of at least $993,791. Third, GT&T argues that the district court erred when it refused to grant GT&T's Rule 50 motion challenging the jury's calculation of the unjust-enrichment claim. GT&T argues that the appropriate measure of recovery is the benefit conferred upon the defendants, which was $993,791.

## II. STANDARD OF REVIEW

An appellate court reviews de novo a district court's ruling on a Rule 50 motion for judgment as a matter of law. Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997). GT&T seeks review of the district court's decisions on two Rule 50 motions. Accordingly, we review the entire appeal de novo.

## III. ANALYSIS

### A. Whether the District Court Erred in Dismissing GT&T's Claim under the FDUTPA

The district court dismissed GT&T's FDUTPA claims, concluding that GT&T could not avail itself of the statute because it was a supplier—rather than a "consumer"—for the transactions in question. It also held that the FDUTPA's 2001

7

amendments should not apply retroactively to this case. We agree with the district court's reasoning on both issues.

The transactions in question all occurred in 1996, so the 1993 amendments to the FDUTPA apply to this case. The definition of "consumer" in the 1993 version of the FDUTPA included not only individuals but also various business organizations, including "corporations." Fla. Stat. Ann. § 501.203(7) (West 1997). In 1993, the Florida legislature amended the stated purposes and rules of construction for the FDUTPA to provide as its central aim the protection of "the consuming public at large and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Id. § 501.22. Before 1993, the same provision stated, "To protect consumers from suppliers who commit deceptive and unfair trade practices." Id. historical & statutory notes.

GT&T argues that the 1993 amendments demonstrated a shift in the FDUTPA to afford protection not just to consumers but also to any legitimate business enterprise that had been injured by an unfair or deceptive business practice. Accordingly, GT&T argues that the fact that it was the supplier in this transaction should not prevent its FDUTPA claims. At least one court has agreed with this

8

general argument.  See Tampa Bay Storm, Inc. v. Arena Football League, Inc., 1998 WL 182418 (M.D. Fla. Mar. 19, 1998).

Here, in dismissing GT&T's FDUTPA claims, the district court cited § 501.211(2) of the Act, which states, "In any individual action brought by a consumer who has suffered a loss as a result of a violation of this part, such consumer may recover actual damages."   The court reasoned that although the definition of "consumer" may include corporations and other business associations, Florida courts have "focused on the *capacity* in which a given entity was acting in determining whether the entity qualified as a 'consumer' and as such could seek monetary damages under the FDUTPA."[4]  The district court relied on Warren Technology, Inc. v. Hines Interests Limited Partnership, 733 So. 2d 1146 (Fla. 3d Dist. Ct. App. 1999), and N.G.L. Travel Associates v. Celebrity Cruises, Inc., 764 So. 2d 672 (Fla. 3d Dist. Ct. App. 2000).  Both of these cases instructed that corporations could not bring suit under the 1993 version of the FDUTPA when they had acted as suppliers or producers rather than as "consumers" for the transactions in question.

The district court was correct to dismiss the FDUTPA claims.  As described above, two decisions by Florida courts have addressed the FDUTPA's application to this very issue, and these decisions support the district court's dismissal of the

---

[4] Order on Defs.' Rule 50 Mot. Concerning Pl.'s FDUTPA Claim, at 2.

FDUTPA claims. Furthermore, even though the 1993 amendments expanded the law's protection to both "the consuming public at large" and "legitimate business enterprises," the language of the statute still only permitted "consumers" to bring actions seeking monetary relief.[5] Fla. Stat. § 501.211(2) (West 1997).

According to GT&T's alternative argument, the FDUTPA's 2001 amendments expanded the pool of possible plaintiffs to include nonconsumers. Even if this were so, we cannot agree with GT&T's contention that the 2001 amendments should apply retroactively. "[I]n the absence of clear legislative intent to the contrary, a law affecting substantive rights is presumed to apply prospectively." Arrow Air, Inc. v. Walsh, 645 So. 2d 422, 424 (Fla. 1992). Here, retroactive application would affect substantive rights by creating rights where none existed before. Therefore, for GT&T to prevail on its argument, the Florida legislature must have clearly intended retroactive application. The Act's text and the legislative history do not provide evidence of clear legislative intent to apply the 2001 amendments retroactively. Therefore, the district court did not err in dismissing GT&T's claims under the FDUTPA.

---

[5] Unlike § 501.211(1), which permitted "anyone aggrieved by a violation" of the Act to bring an action for a declaratory judgment that an act or practice violates the Act, claimants seeking actual damages had to be "consumers." See Fla. Stat. § 501.211(2) (West 1997).

B.       *Whether the District Court Erred in Upholding the Jury's Calculation of GT&T's Compensatory Damages*

In reviewing GT&T's renewed motion for judgment as a matter of law on the amount of compensatory damages, we must decide whether there was a "legally sufficient evidentiary basis for a reasonable jury" to find that GT&T's compensatory damages were $263,155. Fed. R. Civ. P. 50(a). In reviewing the denial of the Rule 50 motion, "we consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).

In reviewing the jury's verdict, it is not our province to substitute our judgment as to the correct measure of damages; instead, we must determine whether the jury's calculation was reasonable in light of the trial evidence. Evidence in the record supports three possible calculations for the number of minutes that MCI routed to Guyana without paying termination charges. One witness stated that the number of minutes was 1,238,377. This calculation of minutes multiplied by the contract rate of $0.85 per minute would have produced $1,052,620 in termination payments. The jury, however, did not believe that GT&T carried its burden to prove all of its alleged compensatory damages, as it awarded only $263,155.

If the jury assumed that the set of "stolen" minutes and the set of all 1996 minutes had roughly the same breakdown of audiotext versus non-audiotext minutes, it reasonably could have concluded that GT&T proved its damages with respect to all of the minutes for non-audiotext calls. Thus, because non-audiotext calls constituted twenty-five percent of the minutes, there would have been approximately 309,594.25 non-audiotext minutes. When multiplied by the contract rate of $0.85 per minute, there would be damages of $263,155 for the non-audiotext minutes. This number is, probably not coincidentally, the exact amount of compensatory damages that the jury awarded.

The next inquiry is whether a reasonable jury could have completely denied recovery for the other seventy-five percent of the minutes. GT&T asserts that the evidence would have compelled a reasonable jury to award it $0.85 for every minute that the appellees "stole." We disagree. The evidence shows that GT&T, following industry custom, usually gave audiotext companies a large percentage of the termination payments generated from audiotext calls. Failing to discount the likely amount of the kickbacks to audiotext companies would ignore industry custom and would place GT&T in a better position than it would have occupied but for the defendants' wrong. Accordingly, it was reasonable for the jury to reduce GT&T's

damages award by the amount of money that GT&T would have "kicked back" to audiotext companies.

Nevertheless, it was not reasonable for the jury to find that GT&T suffered zero damages with respect to the audiotext calls. Even though determining the amount paid in kickbacks is difficult, the trial evidence gives varying rates for the amount of the kickbacks, ranging from $0.40 per minute to $0.525 per minute. Unfortunately, neither side provided the jury with a weighted average for the discount rate. Therefore, because tort law requires an aggrieved plaintiff to prove its damages with a reasonable degree of certainty, see Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc., 206 F.3d 1373, 1376–77 (11th Cir. 2000), we will assume the highest discount rate, $0.525 per minute. Using this figure, the minimum amount of damages that a reasonable jury could have found was $533,462. We arrive at this figure by adding the amount that GT&T would have earned from non-audiotext calls ($248,447.78[6]) and the amount that it would have earned from audiotext calls ($284,984.22[7]). Accordingly, even though GT&T forwarded an incorrect calculation

---

[6] This amount is the product of 1,169,166 minutes (the minimum number of "stolen" minutes) times 0.25 (the percent of "stolen" minutes attributed to non-audiotext calls) times $0.85 per minute (the per-minute rate under the MCI contract with GT&T).

[7] This amount is the product of 1,169,166 minutes (the minimum number of "stolen" minutes) times 0.75 (the percent of "stolen" minutes attributed to audiotext calls) times $0.325 per minute (the discounted per-minute rate, which is the difference between the contract rate of $0.85 per minute and the kickback rate of $0.525 per minute).

of its losses, the district court erred in denying GT&T's Rule 50 motion as to the measure of its damages because the jury's calculation of damages was unreasonable.

C. *Whether the District Court Erred in Upholding the Jury's Calculation of GT&T's Right to Restitution*

In most cases there would be no need to assess the availability and the measure of a restitutionary remedy, as the amount of the plaintiff's loss usually equals the measure of the defendant's gain. But, here, GT&T paid kickbacks to audiotext companies, which practice would have reduced the amount that the defendants would need to pay in compensation to return GT&T to its rightful position. Accordingly, we must address GT&T's restitution claim because GT&T's loss was less than the defendants' gain.

Restitution is a remedy that is often available to victims of a wrong. Restitution measures a plaintiff's recovery according to the defendant's, rather than the plaintiff's, rightful position. Because the jury measured GT&T's right to restitution in terms of GT&T's loss rather than by the benefit conferred on the defendants, the district court erred when it failed to grant GT&T's Rule 50 motion. In cases of wrongful enrichment, a plaintiff whose goods or services were obtained by a conscious wrongdoer generally has two available remedies: compensatory damages or restitution. When the plaintiff elects restitution, the plaintiff can either

14

recover the goods themselves or the fair market value of the transferred goods and services. See Barbouti v. Lysandrou, 559 So. 2d 648, 650–51 (Fla. Dist. Ct. App. 1990) (noting that a defendant's tortiously taking of money or goods belonging to another gives rise to an implied obligation to return that property and that a plaintiff may "'waive' the tort action, and sue instead on a theoretical and fictitious contract of restitution of the benefits which the defendant has so received") (citing W. Prosser & W. Keeton, The Law of Torts § 94, at 672–73). Furthermore, if the goods have been sold by the tortfeasor, the plaintiff may recover either the fair market value of the goods and services (restitutionary remedy) or the proceeds of the sale (disgorgement remedy), and the plaintiff is entitled to the higher.[8] 1 George E. Palmer, The Law of Restitution § 2.12, at 157–58 (1978).

Applying these principles to the present case, the defendants were conscious wrongdoers who conspired to use GT&T's phone networks for calls from the United States to Guyana. The fair market value of these goods and services, as measured by GT&T's contracts with MCI, was $0.85 per minute. The evidence shows that the defendants wrongfully appropriated (and GT&T unknowingly conferred on the

---

[8] As just stated, the law appears to allow the plaintiff in cases such as this to choose not only between loss-based and gain-based awards but also, within the gain-based category, between the higher of the restitutionary award and the disgorgement award. In our analysis, we have not used the language of legal fictions—such as "contracts implied in law" and "waiving the tort"—that sometimes appears in judicial opinions. Instead, we have focused on determining what remedies are available to plaintiffs whose entitlements have been taken by conscious wrongdoers.

defendants) at least 1,169,166 minutes. Therefore, a reasonable jury would have measured GT&T's right to restitution as at least $993,791.

On remand, GT&T may seek restitution from Melbourne, Wajay, and Chilesat, as these three parties obtained a benefit from GT&T through wrongful conduct. Nevertheless, GT&T cannot seek both damages and restitution from the defendants, as doing so would violate the prohibition against receiving double recovery for the same wrong. See Thornber v. City of Fort Walton Beach, 568 So. 2d 914, 919 n.8 (Fla. 1990); Barbe v. Villeneuve, 505 So. 2d 1331, 1332 (Fla. 1987).

## IV. CONCLUSION

For the reasons stated, we AFFIRM the district court's dismissal of GT&T's FDUTPA claims, but we REVERSE the denial of GT&T's Rule 50(b) motion concerning the measure of recovery. We REMAND this case to the district court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.