2011 OK 74

**LUMBER 2, INC., Plaintiff/Appellee,**

v.

**ILLINOIS TOOL WORKS, INC. d/b/a Hobart Welders and Miller Electric Mfg. Co., Defendant/Appellants,**

and

**Don Massie Company, Inc. d/b/a Premier Sales, Defendant.**

No. 106,409.

Supreme Court of Oklahoma.

July 6, 2011.

**1144**

Mark K. Stonecipher, Lance E. Leffel, Oklahoma City, Oklahoma, for Plaintiff/Appellee.

Robert D. Tomlinson, Jennifer C. Schnell, Oklahoma City, Oklahoma, Daniel Laytin, Chicago, Illinois, for Defendant/Appellant.

*OPINION*

WATT, Justice:

¶1 We granted the petition for writ of certiorari of Plaintiff/Appellee Lumber 2, Inc. (Lumber 2) to consider an issue of first impression in this Court: whether Lumber 2, as a retailer and purchaser of merchandise intended for resale in its business, is a "consumer" for purposes of the Oklahoma Consumer Protection Act, (OCPA), 15 O.S.2003 §§ 751–764.1.[1] We answer in the negative.

## PROCEDURAL BACKGROUND

¶2 Lumber 2 sued Defendant/Appellant Illinois Tool Works, Inc., d/b/a Hobart Welders and Miller Electric Mfg. Co. (ITW) and Don Massie Company, Inc., d/b/a Premier Sales,[2] for violations of the Oklahoma Consumer Protection Act (OCPA), 15 O.S. Supp. 2003 §§ 751–764.1, the Oklahoma Antitrust Reform Act (OARA) 79 O.S.2001 §§ 201–212, breach of contract, and fraud. The jury returned a verdict in Lumber 2's favor and awarded money damages against ITW for breach of contract in the amount of $4389.00. Lumber 2 also received a verdict on its claims for violations of the OCPA and the OARA in the amount of $109,000.00, which the trial court tripled to the amount of $327,000.00 pursuant to the OARA's treble damages provision. See 79 O.S.2001 § 205(A)(1). Judgment was filed on June 16, 2008. The trial court's order overruling ITW's Motion for Judgment Notwithstanding the Verdict, or in the alternative, Motion for New Trial was filed on September 15, 2008.

---

1. Lumber 2 raised the following issues for our consideration on certiorari:
   1. Whether Lumber 2 may recover under the Oklahoma Consumer Protection Act (OCPA) as a "consumer;"
   2. Whether ITW unilaterally engaged in conduct which violates the Oklahoma Antitrust Reform Act (OARA);
   3. Whether the Court of Civil Appeals (COCA) failed to consider evidence supporting the verdict for Lumber 2 for OARA violations; and
   4. Whether "invited error" required COCA to apply the *per se* Price Fixing Instruction and

whether a *per se* analysis applied to some of Lumber 2's OARA claims.

2. Scott Massie of Don Massie Company, Inc. settled with Lumber 2 before trial and is not involved in this proceeding. The trial court's judgment reflects the settlement of this claim for $15,000.00 and ordered "the remaining Defendants are entitled to a credit for each sum in determining the final Judgment amount against them."

¶ 3 ITW appealed, and on May 12, 2010, the Court of Civil Appeals (COCA) affirmed the judgment on Lumber 2's breach of contract claim. However, COCA reversed the judgment awarding money damages on Lumber 2's OCPA and OARA claims. Lumber 2 filed its petition for certiorari which we granted on October 12, 2010. We consider only the OCPA claims of Lumber 2. Lumber 2's OARA claims were adequately addressed and disposed of by COCA on review, and they remain undisturbed.

## FACTS

¶ 4 J.P. Fox is co-owner and general manager of Lumber 2, which is a retail home and ranch supply store. He and his father Jim Fox also own Fox Building Supply stores. Altogether, there are stores in five locations in the Oklahoma City, Oklahoma area. J.P. Fox and some company employees attended the Handy Hardware Show, a trade show in Houston, Texas, on September 5, 2003. They stopped at the "Hobart" booth of Defendant ITW where they found Scott Massie, a sales representative of ITW, and Dave Evans from the home office in Wisconsin. Fox had previously met Massie through his business. Massie and Evans showed Fox some new Hobart Champion 10,000 welder/generators ("Champ 10,000's") in which Fox had no interest because of the price. Massie and Evans asked if he would be interested in reconditioned units and handed him a list of items on a yellow legal pad. The list showed that ITW/ Hobart had eleven reconditioned Champ 10,000's for sale. He told them he would buy all eleven of the reconditioned Champ 10,000's. The parties agreed orally that Fox would buy them for $1600.00 each. Fox testified he knew he could sell them for $2000.00 each. Fox called his store from Houston and advised his staff he had contracted to buy the reconditioned product referred to as "recons" and told his staff to prepare an advertisement for publication in the trade magazines and newspapers familiar to his farm and ranch customers.

¶ 5 Upon returning to Oklahoma City, however, Fox received a telephone call from Massie who told him he could not deliver the eleven recons to him because Hobart would not agree to sell them to Fox and Lumber 2. Massie told him the sales manager at Hobart refused to complete the sale because it would "screw up the whole territory" for its existing customers in the area. Fox immediately stopped the ad from running and advised his staff that Lumber 2 would not receive the product. Thereafter, ITW/Hobart sold the recons to Atwood's, a much larger competitor of Lumber 2 which then sold them for $1800.00 each.

¶ 6 Subsequently, Fox bought new welder/generators at retail price through Ace Hardware, also an ITW customer in the area. He advertised them at $1999.00 each, which was approximately the same price at which he had intended to sell the recons. Fox received telephone calls a few minutes apart from Dennis Gerrits, Regional Manager of Miller Electric at factory headquarters on the commercial side of ITW, and from David Anderson of Hobart Welders, on the retail side of ITW, asking him to consider raising his prices for the new product. They explained that some of their retailers had complained and inquired "why you're selling things so cheaply." Fox refused to raise prices, explaining he was forced to buy new Champ 10,000's because ITW had breached its contract with him and Lumber 2 on the "recons". Eventually, Lumber 2 did raise its prices but lost money because it could not compete with the larger stores. Fox alleged ITW sold new product and recons to Lumber 2's competitors at better prices than it sold to Lumber 2 and did so in retaliation for his refusal to raise prices on the new Champ 10,000's.

## STATUTORY CONSTRUCTION

¶ 7 The OCPA does not define the term "consumer." COCA defined "consumer" as "one that consumes; specifically, one that utilizes economic goods," citing *Webster's Third New International Dictionary* 490 (1986). COCA found Lumber 2 is not a "consumer" under the OCPA because it did not "consume" or utilize the product it purchased under the facts of this case. The court held that although Lumber 2 was a potential customer of ITW, it "sought to

obtain a product for resale to the ultimate consumer, the retail customer."

¶ 8 This case presents issues of statutory construction which are questions of law to be reviewed *de novo*; in such cases we exercise plenary, independent, and non-deferential authority. *Welch v. Crow*, 2009 OK 20, 206 P.3d 599. In cases requiring statutory construction, the cardinal rule is to ascertain and give effect to the intent of the Legislature. *Id., Naylor v. Petuskey*, 1992 OK 88, 834 P.2d 439, 440, citing *Humphrey v. Denney*, 1988 OK 69, 757 P.2d 833. The words of a statute will be given a plain and ordinary meaning, unless it is contrary to the purpose and intent of the statute considered as a whole. *Naylor*, supra, at 441, citing *Keck v. Oklahoma Tax Commission*, 188 Okl. 257, 108 P.2d 162 (1940). Legislative purpose and intent may be ascertained from the language in the title to a legislative enactment. *Naylor*, supra.

¶ 9 The title of the OCPA is found at 15 O.S. Supp.2003 § 751. It provides, in part:

An Act relating to **consumer protection;** providing for **protection to buyers** against fraud and certain other practices by sellers . . . .; [emphasis added].

¶ 10 As the title provides, the subject of the Act is **consumer** protection. The Act's protection to **buyers** arises only when they are also "consumers."

3. See ¶ 9.

4. In the 1972 Act, "consumer transaction" was defined as "the advertising, offering for sale, sale, or distribution of any services or any property, tangible or intangible, real, personal or mixed, or any other article, commodity, or thing of value wherever situated, to an individual for purposes that are primarily personal, family or household." 15 O.S. Supp.1972 § 752(A).

5. See 15 O.S. Supp.1980 § 752(B):
   B. "Consumer transaction" means the advertising, offering for sale, sale, or distribution of any services of any property, tangible or intangible, real, personal or mixed, or any other article, commodity, or thing of value wherever situated, for purposes that are personal, household or business oriented.

6. A similar argument was made by the manufacturer of air conditioning air valves in *Warren*

## ARGUMENTS AND DISCUSSION

¶ 11 Lumber 2 claims that COCA ignored common sense definitions of "consumer," including "buyer" and "purchaser," which plainly would be applicable to it. As noted in the language used in the title of the OCPA above,[3] we acknowledge the Legislature has indicated an intent to protect buyers. However, the protection in the OCPA does not extend to buyers in every capacity. It protects buyers who are also "consumers."

¶ 12 Lumber 2 also argues that it is the unique language of the OCPA that distinguishes it from the language of other acts showing that Lumber 2 should be included. It refers to the term "consumer transaction." When the Act was enacted in 1972, "consumer transaction" related entirely to "personal, household and family purposes."[4] In 1980, "business oriented" purpose was added to the definition of "consumer transaction," and "family" purpose was deleted.[5] We assume the Legislature intended to provide the same level of protection to corporations and other legal entities purchasing goods for business use which was already enjoyed by individuals purchasing goods for personal or household use. Nevertheless, the Legislature did not choose to define "consumer" in 1980, nor since then. We further recognize that neither "resale" nor "resell" is found in the OCPA's definition of "consumer transaction."

¶ 13 Lumber 2 also contends it is a "person" involved in a "consumer transaction" for the "business oriented purpose" of "stocking its retail store."[6] Lumber 2 thus appears to

*Technology, Inc. v. Hines Interests Limited Partnership*, 733 So.2d 1146 (Fla.App. 3 Dist., 1999). The plaintiff/manufacturer sued a real estate developer for money damages under the Florida Deceptive and Unfair Trade Practices Act, alleging trade disparagement. Although the applicable Florida Act required an action for monetary relief to be brought by a "consumer," the Act did not define the term. However, the court held that the plaintiff would not be helped by the amended version of the Act which defined "consumer" to include "corporation." Instead, the court considered the plaintiff's actions in the transaction and held:

[T]his addition, however, simply defines who **may** be a "consumer;" it does nothing more. [emphasis added.]
   The 1993 definition of "consumer" does not include the terms "producer" or "manufacturer," both of which may properly be used to

argue that because businesses are "persons" and "consumer transactions" include purposes which are "business oriented" under the OCPA, it qualifies as a "consumer." However, Lumber 2's interpretation overlooks important considerations, i.e., the Legislature chose not to define "consumer" or "business oriented" purposes. Moreover, the definition of "person" has included "corporations" and other legal entities since its enactment in 1972, despite the fact that "consumer transaction" was limited to purposes that were "primarily personal, family or household." In our review of the OCPA, we have discovered the Legislature has used the term "person" in multiple sections of the OCPA in a variety of capacities relating to consumer transactions. These capacities include a person who is the victim of a "deceptive trade practice,"[7] retailers violating the OCPA in good faith,[8] and a person who engages in practices declared to be unlawful under the OCPA.[9] When the OCPA first became law in 1972, the term "person"[10] was used to indicate a natural person and specific categories of legal entities applicable to the OCPA, as follows:

> A. "Person" means a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity.

¶ 14 The current statute, 15 O.S. Supp.2003 § 752(1), is identical except for the 1983 amendment changing "and" to "or" followed by "any other legal entity;".

¶ 15 COCA correctly considered the plain and ordinary meaning of the term "consumer" which we are required to do with an undefined statutory term. See *Naylor v. Petuskey*, supra. In considering the "plain and ordinary" meaning of "consume" or "consumer,"[11] we also note the following which focus on using the goods which are purchased:

> "Consumer." One who uses economic goods and so diminishes or destroys their utilities; opposed to producer. *Black's Law Dictionary, Revised Fourth Edition* (1968).

> **consumer.** A person who buys goods or services for personal, family, or household use, with no intention of resale; a natural person who uses products for personal rather than business purposes. *Black's Law Dictionary, Ninth Edition* (2009).

> consumer—1. One that consumes. 2. *Economics.* One who acquires goods or services; a buyer. *The American Heritage Dictionary of the English Language, New College Edition* (1980).

> consume—1. To eat or drink up; ingest. 2. To expend (fuel, for example); use up. 3. To waste; squander. 4. To destroy, to level. 5. To absorb, engross. *The American Heritage Dictionary of the English Language, New College Edition* (1980).

¶ 16 Lumber 2 also contends the OCPA does not exempt businesses from recovering under the Act and that COCA improperly created an exception to recovery which does not exist. It contends that COCA violated

---

> classify the plaintiff. Thus, the plaintiff's interpretation of the term is not viable. While we agree that the plaintiff is a corporation and, therefore, could be a consumer under the 1993 version of the Act, the fact that it **acted as the producer** in the instant transaction precludes recovery. [emphasis added.]
> 773 So.2d at 1148.

**7.** 15 O.S. Supp.2003 § 752(13):
> 13. "Deceptive trade practice" means a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a **person** to the detriment of that **person** .... [emphasis added].

**8.** 15 O.S. Supp.2003 § 754(2):
> Nothing in this act shall apply to:
> . . .

> 2. [a]cts done by retailers or other **persons** acting in good faith on the basis of information or matter supplied by others and without knowledge of the deceptive character of such information or matter. [emphasis added].

**9.** See gen., 15 O.S. Supp.2003 § 753, 15 O.S. 2001 § 756.1, and 15 O.S.2001 § 757.

**10.** 15 O.S. Supp.1972 § 752(A).

**11.** The provisions of the Uniform Commercial Code may be applied by analogy. See Oklahoma Code Comment, 12A O.S. Supp.2006, § 1–102. "Consumer" is defined at 12A O.S. Supp.2006, § 1–201(b)(11), which provides:
> (11) "Consumer" means an individual who enters into a transaction primarily for personal, family, or household purposes.

the rule of statutory construction requiring courts to consider only the statutory language used and not read into it exceptions not made, citing *Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Comm'n,* 1988 OK 117, 764 P.2d 172, 179. However, COCA did not hold that Lumber 2 could not recover under the OCPA because it was a business. Its holding was based entirely on the fact Lumber 2 did not purchase the product **to use in its business.**

¶ 17 ITW argues that the issue is **not** whether Lumber 2 is a "person" or whether a corporation could sometimes be a "consumer." ITW agrees with COCA that the ordinary and plain meaning of "consumer" is one who consumes. Therefore, it contends Lumber 2, a retailer buying welder/generators for resale to its customers, is a supplier, not a consumer, under the OCPA because it did not "consume" or "use" the product. Thus, it argues Lumber 2 is unable to bring a private action against it under the OCPA.

¶ 18 In its petition for certiorari, Lumber 2 cited cases from other jurisdictions which held that businesses were "consumers." However, we find the reasoning in those cases, *Big H Auto Auction, Inc. v. Saenz Motors,* 665 S.W.2d 756 (Tex.1984), (reh. denied) (retailers who purchased goods for resale were "consumers" under the Texas Act); and *Dreier Co., Inc. v. Unitronix Corp.,* 527 A.2d 875, 882, 218 N.J.Super. 260, 273 (1986) (a merchant who bought a computer for its business use was a "consumer" under the New Jersey Act) give more support to ITW's arguments and to COCA's holding in this case than to Lumber 2's position.[12]

¶ 19 COCA relied on *Guyana Telephone & Telegraph Co., Ltd. v. Melbourne International Communications, Ltd.,* 329 F.3d 1241 (11th Cir.2003), in deciding Lumber 2 is not a consumer for purposes of the OCPA. The Eleventh Circuit court construed the Florida Deceptive and Unfair Trade Practices Act (Florida Act). "Consumer" was defined in the Florida Act which included "corporations." The Act had been amended to include an intent to protect the "consuming public at large and legitimate business enterprises" from unfair practices. The plaintiff argued it was a corporation and that the Act was intended to protect legitimate business enterprises and should protect it, despite the fact it was a supplier. The appellate court noted that the Act at that time still required

---

12. In *Big H Auto,* the Texas Supreme Court discussed whether a merchant who purchases autos for resale was a "consumer" under the Texas Deceptive Trade Practices Act, i.e., whether resale of the goods constituted a "use" of the goods under the act. The Court noted the legislative history showed that prior to final passage, the word "final" was stricken from the proposed term "final use" because it was too restrictive and thus contrary to the statutory mandate to construe the act liberally. Also, the act was amended to add "corporations" and "partnerships" to the definition of "consumer," and the "commercial or business use" exemption was deleted. Thus, the Texas Supreme Court held that an auto dealer who purchased a car for resale was a "consumer" under the Texas act. The Texas Act is distinguishable from the OCPA. The Texas legislative history supports a finding the business was a consumer. Oklahoma does not have the benefit of legislative history.

In *Dreier,* a merchant in a sporting goods company purchased a computer system for use in his business for customer billings, inventory control and accounts receivable and accounts payable. The purchaser had no knowledge or expertise in computer systems and relied on the defendants to design a system which would be useful in the business. The merchant brought a claim for treble damages under the New Jersey Consumer Fraud Act (NJCFA). While the initial issue was whether the plaintiff brought its action within the applicable statute of limitations for its various claims, it became necessary to determine whether the plaintiff was a "consumer" for purposes of the NJCFA. Similar to the OCPA, "consumer" is not defined under the New Jersey act. The defendant argued that as a merchant, the plaintiff was not a "consumer" and therefore had no claim under the act. The New Jersey appellate court disagreed, setting out the definition of "person" under the act, noting that it included partnerships, corporations, companies or business entities. However, the court further explained its reasoning:

> [E]ven the most world-wise business entity can be inexperienced and uninformed in a given consumer transaction. Unlawful practices thus can victimize business entities as well as individual consumers.
>
> Indeed, according to plaintiff, it had absolutely **no experience in computers** and was therefore **just as vulnerable to unconscionable business practices as a private consumer would have been in the circumstances.** (emphasis added)

527 A.2d 875, 882, 218 N.J.Super. 260, 273.

actions to be brought by "consumers"[13] and cited cases from Florida state courts which considered the capacity of the buyer involved in the purchase to determine whether a plaintiff was a "consumer." Because the plaintiff was a supplier, rather than a consumer, it could not pursue a claim under the Florida act. Accord, *Warren Technology, Inc.*, supra, note 6; and *N.G.L. Travel Associates v. Celebrity Cruises, Inc.*, 764 So.2d 672 (Fla.3d Dist.Ct.App.2000).

¶ 20 In Oklahoma, as well, "aggrieved consumers" have claims against violators of the OCPA for monetary damages. See 15 O.S. Supp.1999 § 761.1(A). Similar to the Florida Act, the OCPA gives a "consumer" the right to bring a claim for violation of its rights under the Act. Thus, under the plain and ordinary meaning of "consumer," i.e., one who consumes or uses economic goods, Lumber 2 has no claim under the OCPA. The fact Lumber 2, a "person," purchased the welders for a "business oriented" purpose does not make the transaction a "consumer transaction" for purposes of the OCPA. In this case, Lumber 2 purchased the welder/generators for the "business oriented" purpose of selling them to their retail customers. Lumber 2 is not a consumer in this case.

¶ 21 Our holding does not mean that Lumber 2, as a corporate entity, could never be a consumer under different facts. However, the purchase would have to involve goods which Lumber 2 bought to use in its own business, not to resell to its customers. In describing the importance to Lumber 2's business of obtaining the "recons," J.P. Fox testified:

> That is—that's what makes this thing a niche item for us, is that it is reconditioned, you know, it has all these features that I've just explained.

> But what makes it so awesome for me was that it was reconditioned. It gave us something that our competitors didn't have, gave us something **to go out there and present to our customers** that would

have given us a good promotion.[14] [emphasis added].

¶ 22 Lumber 2's intent under the current facts was to buy the new and reconditioned Champ 10,000's to sell to their farm and ranch customers, despite its contention on certiorari that it purchased the product to "stock" or "supply" their retail store. Lumber 2 clearly described its intent not only to stock their stores, but also to resell the product to its customers, the intended "ultimate consumers." Just as we would not imply legislative intent to provide a private right of action for OCPA violations before 15 O.S. § 761.1 was amended to allow for such action, see *Holbert v. Echeverria*, 1987 OK 99, 744 P.2d 960, *Walls v. American Tobacco Company*, 2000 OK 66, 11 P.3d 626, we will not imply legislative intent to allow a plaintiff who purchases goods for resale to its customers to seek relief as a "consumer" under the OCPA. Such direction must come from the Legislature.

### CONCLUSION

¶ 23 Lumber 2 was not a consumer for purposes of the OCPA under the factual circumstances of this case. The trial court's judgment entered for Lumber 2 on its breach of contract claim will remain undisturbed. The judgment on the remaining claims is reversed.

¶ 24 **OPINION OF COURT OF CIVIL APPEALS IS VACATED; JUDGMENT OF TRIAL COURT IS AFFIRMED IN PART AND REVERSED IN PART.**

TAYLOR, C.J., COLBERT, V.C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, REIF, GURICH, JJ., concur.

COMBS, J., dissents.

---

**13.** The statute has since been changed which arguably would allow non-consumers to bring an action under the Florida Act. The issue has not been settled by the Florida courts.

**14.** Trial Transcript, Vol. Two, pages 11–12, January 15, 2008.