2012 OK 21

Lee Weldon JAMES, Carolyn Jones, Bobby Nall, Barbara Nall, Shirley Potts, Carla Holmes, P & H Partnership, Steve Pratt, Vicki Pratt, Linda Strawn, and Gloria Michelle Strawn, Plaintiffs/Appellees,

and

Rusty Armstrong, Diane Armstrong, Tim Bartlett, Jimmy Beam, Cheryl Callaway, Burl G. Chappell, Mike Converse, Tonya Converse, Darlene Gibson, Darlene Gibson Farm, Jerry L. Dollarhide, Jeff Engler, William L. Evans, Hazel Fennell, James D. Gamble, Johnny Gilbreath, Gilbreath Farm, Wanda Goodman, J & W Farm, Justin Graham, Rocky Green, Rebecca Green, Blaine Horton, Ernestine Horton, Ginger Johnson, Billy Johnson, James E. Latta, Ivan Lowrey, Sandra Meeks, Judy Gale Nichols, Tracy C. Pond, Wesley Roberts, Carlene Sharrock, Richard Smith, Larry D. Stewart, Benny Strawn, Lewis Timbes, Roger W. Virgin, Jeff Donald Watson, Earl Westbrook, Joyce Westbrook, Linda Westbrook, and Ladonna Williams, Plaintiffs,

v.

TYSON FOODS, INC.; Tyson Poultry, Inc.; Russell Adams, Defendants/Appellants,

and

Harriet Piper, Defendant.

No. 109,046.

Supreme Court of Oklahoma.

March 6, 2012.

Rehearing Denied Dec. 11, 2012.

Michael Burrage, Whitten Burrage Law Firm, Oklahoma City, Oklahoma, Bill W. Burgess, Burgess & Hightower Law Firm, Lawton, Oklahoma, Robert T. Adams, pro hac vice, John S. Johnston, pro hac vice, Shook, Hardy & Bacon L.L.P., Kansas City, Missouri, for Defendants/Appellants.

Glenn D. Adams, Norman, Oklahoma, Jim Loftis, Loftis & Barnard, Norman, Oklahoma, for Plaintiffs/Appellees.

WATT, J.:

¶ 1 At the behest of Tyson and with the agreement of the poultry growers, we retained this cause to address two questions. The first is whether Tyson is entitled to a new trial under facts where questioning was limited to matters not covered by the jury questionnaire and the answers given in that document were incomplete, untruthful, and/or misleading. The second is a first impression issue: whether poultry growers, having no title to the chickens or the feed in their possession, are "aggrieved consumers" entitled to the protections of the Oklahoma Consumer Protection Act [Consumer Protection Act], *15 O.S.2001 § 751 et seq.*?

¶ 2 *Dominion Bank of Middle Tenn. v. Masterson,* 1996 OK 99, 928 P.2d 291 is instructive on the first issue. It holds that where a juror's answer to a question regarding his involvement in civil litigation prevented legal counsel from delving deeper into the juror's qualifications, a new trial was warranted. Here, jurors gave incomplete, misleading, and/or false answers on juror questionnaires. Additionally, attorneys were advised that they could not ask questions already covered in those documents. Under these facts, the appellants are entitled to a new trial.

¶ 3 The instant cause resolved only a fraction of the lawsuits pending between Tyson and the growers, all of which involve the question of whether the contract growers are "aggrieved consumers" entitled to the protections of the Oklahoma Consumer Protection Act. We answer the second question as a matter of public policy and in an attempt to eliminate the squandering of the parties' time and money, legal, and judicial resources. Recently, in *Lumber 2, Inc. v. Illinois Tool Works, Inc.,* 2011 OK 74, 261 P.3d 1143, we held that a purchaser of goods for resale was not a consumer entitled to the protection of the Consumer Protection Act. Consistent with our reasoning in *Lumber 2,* we determine that the contract growers are not "aggrieved consumers" entitled to the protections of the Oklahoma Consumer Protection Act.[1]

## FACTS AND PROCEDURAL BACKGROUND

¶ 4 Tyson is an integrated poultry company. Such companies operate a system wherein they contract with independent growers to **raise chickens owned and provided by the company.**[2] Tyson places chicks

---

1. There is little judicial guidance available on the issue presented and what case law there is seems inconsistent even within the jurisdictions having addressed similar causes. *Bunting v. Perdue, Inc.,* 611 F.Supp. 682 (E.D.N.C.1985) [Contract poultry grower could not be characterized as "consumer" with regard to his service contracts with integrated poultry producer.]. But see, *City of Clinton, Arkansas v. Pilgrim's Pride Corp.,* 654 F.Supp.2d 536 (N.D.Tex.2009) [Poultry growers' allegations that they pay for supplies and services of supplier sufficient to support a conclusion that they purchase or at least lease supplies and services.] The Texas Court's holding is inconsistent with a later ruling by the Bankruptcy Court. Under facts strikingly similar to those presented in this cause, the federal court held there was no consumer protection in a contract between an independent chicken grower and Pilgrim's Pride. *In re Pilgrim's Pride Corp.,* 2011 WL 3799835 (Bankr.N.D.Tex.2011) ]; *Philson v. Cold Creek Farms, Inc.,* 947 F.Supp. 197 (E.D.N.C.1996) [Holding that one need not necessarily be a "consumer" to bring a cause of action under N. Carolina's deceptive practices legislation but noting that the finding is contrary to *Bunting v. Perdue, Inc.,* this note, supra.]. See also, *Miller v. Conagra, Inc.,* 2008–0021, 991 So.2d 445 (La. 2008) allowing growers to go forward with consumer protection claims where the issue was waived on the trial court level.

2. Broiler Production Contract providing in pertinent part:

  "... 2. *Duties of Company.*

with an independent grower for the grow-out period, providing the grower with feed. It is the growers' responsibility to raise the chickens to a target processing weight. Once the flock reaches maturity, Tyson transports the chickens to its processing plant. It may also take possession of any feed remaining on the growers' farms at the end of the growing cycle.

¶ 5 **The poultry company retains title to the birds and the materials provided for their development while the chickens are in the care of the independent grower.**[3] Tyson pays its growers according to a formula that measures the relative productivity of the growers by comparing the amount of feed provided and the weight of the chickens at maturity.[4]

¶ 6 On May 8, 2008, fifty-four (54) growers filed suit against Tyson. Although they did not allege any contractual breach, they asserted that the company committed negligence, fraud, and violated the Consumer Protection Act. The growers insisted that they were targeted with poor quality birds and feed because they refused to upgrade their chicken houses from conventional to "cool cell" facilities.

¶ 7 Tyson's request that the cause be severed and that individual trials be conducted was denied. Instead, the trial court ordered

> A. Company will furnish Producer with and will retain title and ownership to chickens, feed, and medication. Company will determine the amount, type, frequency, and time of delivery to and pick-up from Producer of chickens, feed, and medication.
> B. Company will provide veterinary services and technical advice to assist Producer's production of Broilers . . . ."

3. *National Broiler Marketing Ass'n v. United States*, 436 U.S. 816, 98 S.Ct. 2122, 56 L.Ed.2d 728 (1978); *Sanderson Farms, Inc. v. Ballard*, 917 So.2d 783 (Miss.2005).

4. *Terry v. Tyson Farms, Inc.*, 604 F.3d 272 (6th Cir.2010).

5. Rule 15, Rules for District Courts, 12 O.S.2001, App., providing in pertinent part:
   "a. Before filing any motion to disqualify a judge, an *in camera* request shall first be made to the judge to disqualify or to transfer the cause to another judge . . . ."

6. Transcript of Proceedings, Motion Hearing, September 8, 2010, providing in pertinent part at pp. 129–30:

that the cases be divided so that groups of individuals/farms constituted the plaintiffs in each action. The first trial consisted of eleven (11) plaintiffs representing seven (7) farms.

¶ 8 The jury trial commenced on March 10, 2010, and continued for approximately three weeks. Nine members of the jury found in favor of the growers on all counts while three jurors were unconvinced of Tyson's alleged wrong-doing. The plaintiffs were awarded compensatory and punitive damages of approximately $10 million.

¶ 9 Following the trial, Tyson filed a motion requesting that the trial judge disqualify himself[5] based on a variety of concerns. After an *in camera* hearing held on May 28, 2010, the trial judge agreed to recuse himself because he did not feel he could be impartial towards a recently appearing attorney of record. Thereafter, the Chief Justice assigned a substitute judge.

¶ 10 Tyson filed a motion for new trial on June 9, 2010. After the hearing on the motion on July 18th and despite grave misgivings expressed by the new trial judge, the motion was overruled.[6] The new trial judge stated continuing concerns when the motion to stay further trials in the cause pending resolution of the current appeal was argued on October 27, 2010.[7]

> " . . . THE COURT: Okay. All right, I appreciate the guidance that you have on the Court's role here today. The—there's many things about this case that concern me. We talked about the lack of the answer on the juror questionnaire and so forth. The—some of the evidentiary things concern me, but in my role as the—as the trial judge, I don't think the motion for new trial will stand. I'm going to overrule it but, Mr. Brodeur, I'm going to tell you my confidence in my ruling is just a hair above fifty percent. I'm not completely confident in this decision and, quite frankly, my—as I said, I like to respect the verdict of the jurors and rulings made by other judges, but I've got some extreme concerns and, just for future reference, there's a new sheriff in town on these cases and some of these rulings will not be the same as they were in the first trial, I'm just going to tell you that straight up . . ."

7. Transcript of Proceedings, October 27, 2010, providing in pertinent part at p. 12:
   " . . . THE COURT: . . . .This Consumer Protection issue pops up in my mind. I'm not sure

¶ 11 Further trials were stayed pending appeal of this cause on December 3, 2010. On December 28, 2010, Tyson filed its petition in error along with an unopposed motion to retain. The motion to retain was granted on January 19, 2011. Although the briefing cycle was completed on June 14, 2011, the final record filings were not concluded until July 18th.

### Standard of Review

¶ 12 The trial judge ruling on the motion for new trial found himself in an unfamiliar position.[8] He did not: preside at the trial; hear the testimony; observe the witnesses; or have full knowledge of the proceedings during the trial process. Were that the case, it is well settled that our review standard would be one of abuse of discretion.[9] Abuse of discretion occurs if the trial court errs with respect to a pure, simple, and unmixed question of law[10] or where the trial court acts arbitrarily.[11] Nevertheless, the strength of the showing for error or abuse of discretion is much less when the trial court refuses to grant a new trial than when such a motion is sustained.[12]

¶ 13 Like the assigned judge, we find ourselves in a unique situation. One judge conducted the trial and the second, assigned judge heard the request for new trial. We have a transcript of that hearing and all filings associated with the motion for new trial and judgment notwithstanding the verdict. Because we are in as good a position to address the issues presented as the second,[13] assigned judge hearing the respective motions, our review is *de novo*.[14]

¶ 14 We must also address an issue of law intricately entwined in the trial process: whether the contract growers are "aggrieved consumers" entitled to the protections of the Consumer Protection Act. This is a legal question involving statutory interpretation. It, also, is subject to *de novo* review, *i.e.*, a non-deferential, plenary, and independent review consideration of the trial court's ruling on this issue.[15]

---

how we get that cause of action in this case, so I've got some differences of opinion, and as I said before, I'm not any—I don't claim to be any smarter than Will—or Judge Driesel, but sometimes it's helpful to the Court to have an appellate opinion to work by, so that's kind of my quandary here. There are advantages and disadvantages to staying the case, and I can't—it's wrong for a trial judge to try to wait on the appellate courts, whether it's the Court of Civil Appeals or the Supreme Court. It's wrong for me to wait on them to make a decision that I need to make, so I'm not—I'm not looking to get bailed out of a tough decision. I could make the decision but I see things quite a bit differently than Judge Driesel did, so there's a difference of opinion there that I'm concerned about, so that's kind of what I want to talk about today, the advantages and disadvantages of staying this case pending an appeal...."

8. Transcript of Proceedings, September 8, 2010, providing in pertinent part at pp. 122–23:
"... THE COURT: Okay. I don't have any right at the present time, I'm still, as I told you, in twenty-eight years I've never sat in this position of a motion for new trial from another judge's trial, and I doubt there's any kind of authority on that, but I'm a little confused about my role here; am I judge Driesel now, I mean, is this my trial? I guess I am or, you know am I some sort of appellate—intermediate appellate court, and I'm not comfortable in that function, so if you all have any input on that or any comments on that, I'd be interested to hear, because I'm going to be honest with you, I've done this twenty-eight years and I've never set aside a jury verdict, not one time in a criminal or civil case, but I've got some concerns about this trial, I'm going to tell you, but I'm just—I'm really confused about my role here, is what I'm struggling with most...."

9. *Head v. McCracken*, 2004 OK 84, ¶ 2, 102 P.3d 670; *Evers v. FSF Overlake Associates*, 2003 OK 53, ¶ 6, 77 P.3d 581.

10. *Head v. McCracken*, see note 9, supra; *Mooney v. Mooney*, 2003 OK 51, ¶ 50, 70 P.3d 872.

11. *Dominion Bank of Middle Tennessee v. Masterson*, 1996 OK 99, ¶ 16, 928 P.2d 291.

12. *Sligar v. Bartlett*, 1996 OK 144, ¶ 13, 916 P.2d 1383; *Propst v. Alexander*, 1995 OK 57, ¶ 8, 898 P.2d 141. See also, *Dominion Bank of Middle Tennessee v. Masterson*, note 11, supra; *Fitts v. Standard Life & Accident Ins. Co.*, 1974 OK 60, ¶ 28, 522 P.2d 1040.

13. *Barr v. State of Kansas*, 287 Kan. 190, 196 P.3d 357 (2008).

14. *Id.*; *Kannianen v. White*, 2010 ND 170, 788 N.W.2d 340; *Gertz v. Anne Arundel County*, 339 Md. 261, 661 A.2d 1157 (1995), *cert. denied*, 516 U.S. 990, 116 S.Ct. 522, 133 L.Ed.2d 429 (1995).

15. *Head v. McCracken*, see note 9, supra; *Fulsom v. Fulsom*, 2003 OK 96, ¶ 2, 81 P.3d 652.

¶ 15 a) **Jurors gave incomplete, misleading and/or untruthful answers on juror questionnaires and attorneys were advised that they could not ask questions already covered therein. Under these facts, the appellants are entitled to a new trial.**

▮ ¶ 16 Tyson insists that it did not receive a fair trial. It asserts multiple instances of juror misconduct including omission of information vital to the *voir dire* and selection process [16] exacerbated by limitations imposed on questioning during jury selection. The growers argue that Tyson is barred from complaining about the lack of truthfulness on the *voir dire* questionnaires by its failure to make further inquiry during the jury selection process. Under the facts presented, we disagree with the growers' position.

¶ 17 All jurors were presented with an eight (8) page juror questionnaire containing questions relating to their participation in civil litigation and any criminal history. The trial judge made it clear in the pre-trial order filed on July 29, 2009, that "[d]uring voir dire, attorneys **will not be allowed to ask any questions already answered in the questionnaire.** Attorneys will be allowed a brief, supplemental voir dire." At least two of the Tyson attorneys allege that the trial court instructed that *voir dire* would be limited to thirty (30) minutes.[17] The trial judge disputed the time limitation, indicating that if there was any such restriction, it arose as a result of the agreement of the parties.[18] Nevertheless, during the *voir dire* process, the jury was told that the attorneys would be asking questions to "**supplement [the] questionnaire forms**" and would be allowed to inquire into "social, religious or moral issues **that have not already been asked of you in the questionnaire.**"[19]

16. Our determination that a new trial must be granted on grounds of errors relating to *voir dire* negates our need to address other alleged errors in the trial process, *i.e.* individual jurors vouching for the veracity of certain plaintiffs with an intent to sway the other panel members' votes while in deliberations [See, 12 O.S.2011 § 2606 (B); *Willoughby v. City of Oklahoma City*, 1985 OK 64, 706 P.2d 883; *Harris v. State*, 2007 OK CR 32, 167 P.3d 438; *Thompson v. Krantz*, 2006 OK CIV APP 60, 137 P.3d 693.]; what testimony is competent when the concern involves juror testimony or affidavits [*Willoughby v. City of Oklahoma City*, this note, supra]; whether the growers could recover damages in tort notwithstanding the lack of allegations of breach of contract [A person injured by the substandard performance of a duty derived from a contractual relationship may rely on a breach of contract or tort theory, or both but even if the evidence supports both, the claimant can achieve but a single recovery. See, *Estate of Hicks*, 2004 OK 36, 92 P.3d 88; *Finnell v. Seismic*, 2003 OK 35, 67 P.3d 339. Generally, in ordinary commercial contracts, a breach of good faith and fair dealing generally merely results in damages for breach of contract, not independent tort liability. *Wathor v. Mutual Assurance Administrators, Inc.*, 2004 OK 2, ¶ 5, 87 P.3d 559.]

17. Exhibit 4 to the Defendants' Memorandum in Support of Their Motion for New Trial, filed under seal on June 9, 2010 providing in pertinent part:
"... *DECLARATION OF VINCENT O. CHADICK IN SUPPORT OF DEFENDANTS' POST-TRIAL MOTIONS*
... 3. At the second pre-trial conference held in the Armstrong Case on Tuesday, March 9, 2010 (which was in its entirety conducted off-the-record at the instruction of Judge Willard Driesel), Judge Driesel directed the parties that 'each side' (that is, all plaintiffs one side, all defendants one side) would be allowed 30 minutes for voir dire. I communicated this instruction on the 30 minute limitation to my co-counsel, who conducted voir dire. We did not 'agree between the parties' that voir dire would not 'take any longer than that'....'"
"... *DECLARATION OF L. BRYAN BURNS IN SUPPORT OF DEFENDANTS' POST–TRIAL MOTIONS*
... 3. Prior to trial, the Trial Court directed that each side should limit their *voir dire* to 30 minutes....'"

18. Transcript of proceedings, May 28, 2010, providing in pertinent part at p. 31:
"... MR. JOHNSTON: ... [T]he reports that I have is that [*voir dire*] was limited to 30 minutes ...
THE COURT: Well, let me put it this way. If it was limited, it was off the record and it was by agreement between the parties that they wouldn't take any longer than that. I have never imposed a limitation of any kind on voir dire....'"

19. Transcript of jury trial, March 15 to April 2, 2010, providing in pertinent part at pp. 122–23:
"... THE COURT: ... Now the attorneys for both the Plaintiffs and the Defendants will be allowed to ask you questions that supplement your questionnaire forms that you have already returned.... The attorneys are allowed to ask you questions concerning your ideas on social,

¶ 18 One juror left the portion of the juror questionnaire containing the questions relating to arrests blank after writing "N/A" four times on the section denominated "CRIMINAL JUSTICE EXPERIENCE." The same juror had previously: pled guilty to a felony; and been charged with feloniously pointing a firearm, domestic abuse, and assault and battery.[20] The juror also responded in kind to questions relating to whether or not he had ever filed or been a defendant in a civil suit and a related question on how such an experience might affect his judgment.[21] Despite the "N/A" designation, the juror had been a defendant in a minimum of three (3) civil suits.

¶ 19 Another juror, who may have been disqualified on residency status,[22] did not reveal that her aunt would be a plaintiff in one of the upcoming trials between growers and Tyson. A third juror indicated that he had been involved in civil cases in 1996 and in 2000. Tyson's research revealed that the juror had been sued in 1997, 2001, 2003, and that he had filed bankruptcy in the United States District Court in the Western District of Arkansas in 2000.[23] Three other jurors' questionnaires contained inaccuracies involving similar concerns relating to either criminal convictions or civil litigation histories.[24]

¶ 20 This Court has long recognized that parties have a right to question prospective jurors concerning matters relevant to their fitness to sit in a particular case[25] and that where a prospective juror, on *voir dire* examination, gives false or deceptive answers to questions pertaining to their qualifications resulting in counsel being deprived of further opportunity to determine impartiality, a new trial is warranted.[26] The jury questionnaires distributed here clearly advised prospective jurors that their signatures were placed thereon "**under penalty of perjury that the answers . . . [we]re true and correct.**"

¶ 21 We addressed the issue of a juror giving untruthful answers to a question during *voir dire* in *Dominion Bank of Middle Tenn. v. Masterson*, 1996 OK 99, 928 P.2d 291.[27] There, the jurors were asked if they knew any of the parties or their attorneys. The juror in question indicated that he did not know the parties and that the only lawsuit in which he had been involved was an easement dispute. After the verdict in favor of the plaintiff, the defendant's attorney learned that the juror had been a party to twenty-two lawsuits, including one involving the defense attorney. We stated:

> We need not determine whether the juror was biased against [the defendant] nor whether he had some influence upon the other jurors. It is enough that [the defendant] was deprived of an opportunity to delve deeper into [the juror's] qualifica-

religious or moral issues that have not already been asked of you in the questionnaire...."

20. See, Title 38 O.S.2011 § 28 (C) providing in pertinent part:
"... Persons who are not qualified to serve as jurors are:
... 5. Persons who have been convicted of any felony or who have served a term of imprisonment in any penitentiary, state or federal, for the commission of a felony; provided, any such citizen convicted, who has been fully restored to his or her civil rights, shall be eligible to serve as a juror ..."

21. See, Exhibits 5–7 to the Defendants' Memorandum in Support of Their Motion for New Trial, filed under seal on June 9, 2010.

22. Apparently, the juror had indicated that she resided in Choctaw County in January of 2010 on a marriage application but swore, in conformance with 38 O.S.2011 § 20.1, that she was a resident of McCurtain County. See, Exhibits 10–

11 to the Defendants' Memorandum in Support of Their Motion for New Trial, filed under seal on June 9, 2010.

23. See, Exhibits 14–21 to the Defendants' Memorandum in Support of Their Motion for New Trial, filed under seal on June 9, 2010.

24. See, Exhibits 23–32 to the Defendants' Memorandum in Support of Their Motion for New Trial, filed under seal on June 9, 2010.

25. See, *Lee v. Swyden*, 1957 OK 331, ¶ 12, 319 P.2d 1009.

26. *Stillwell v. Johnson*, 1954 OK 189, ¶ 0, 272 P.2d 365.

27. See also, *Neumann v. D.L. Arrowsmith, D.O.*, 2007 OK 10, 164 P.3d 116 [Juror's failure to divulge fact that he had been non-prevailing party to a prior lawsuit warranted order granting motion for new trial.].

tions during *voir dire* and under Oklahoma case law, is entitled to a new trial.[28]

Here, several jurors gave incomplete, untruthful, and/or misleading answers when completing the forms in a situation where the attorneys were not only discouraged but also barred from asking any questions covered in the juror questionnaire. Under these facts and with guidance from the *Dominion* Court, we determine that Tyson is entitled to a new trial.

¶ 22 **b) A poultry grower, having no title to the chickens or feed placed with the grower for fattening and future marketing of the birds by the flock's owner, is not an "aggrieved consumer" for purposes of the Oklahoma Consumers' Protection Act.**

█ ¶ 23 Although we have determined that a new trial is appropriate, there is another issue which is central to this litigation and to the multiple trials which will follow involving Tyson and other growers, *i.e.* whether poultry growers, having no title to the chickens or the feed in their possession, are "consumers" entitled to the protections of the Consumer Protection Act. The matter is one of first impression within the framework of public policy concerning consumer protection.[29] We realize that if we should refuse to answer the issue raised here, these parties and/or their counterparts will simply return at a later date with the same question.[30] Therefore, we have an obligation to rule on the issue so that this and the subsequent

trials may resume and proceed in an orderly fashion based upon our decision today.[31]

¶ 24 The contract growers assert that the Consumer Protection Act is not limited to transactions between buyers and sellers. In so doing, they rely upon the Act's definition of "consumer transaction" referring to "distribution of any services or any property. . . .for purposes that are . . . business oriented."[32] Tyson takes the opposite position, insisting that the growers have purchased no goods or services, are not "consumers," and cannot seek the protection of the Consumer Protection Act. We agree with Tyson's analysis of the law.

█ ¶ 25 Consumer protection laws began to appear on the legal scene in the mid–1960's to prevent fraud and deception in consumer transactions. Generally, in order to impose liability under a state deceptive trade practice and consumer protection act, it is necessary that the injured party be a "consumer" entitled to protection under the act.[33]

¶ 26 The Court recently addressed the scope of Oklahoma's Consumer Protection Act in *Lumber 2, Inc. v. Illinois Tool Works, Inc.*, 2011 OK 74, 261 P.3d 1143. At issue in *Lumber 2* was whether a retailer could be a consumer within the meaning of the Act. Under the facts presented, where Lumber 2 intended to purchase reconditioned welders for sale to its customers rather than for its own use and consumption, this Court determined it was not a consumer within the meaning of the Consumer Protection Act.

"... 'Consumer transaction' means the advertising, offering for sale or purchase, sale, purchase, or distribution of any services or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever located, for purposes that are personal, household, or business oriented . . ."

**28.** *Id.; Hutson v. Sureddi*, 2002 OK CIV APP 28, ¶¶ 11–12, 41 P.3d 993.

**29.** *Tuttle v. Kelly–Springfield Tire Co.*, 1978 OK 134, ¶ 12, 585 P.2d 1116.

**30.** See, *Council on Judicial Complaints v. Maley*, 1980 OK 32, ¶ 9, 607 P.2d 1180.

**31.** *Federal Land Bank of Wichita v. Story*, 1988 OK 52, ¶ 4, 756 P.2d 588. Allowing trial judges to continue to give instructions on an issue irrelevant to the cause of action in a jury trial would merely invite fundamental error requiring the granting of new trials. *Fletcher v. Monroe*, 2009 OK 10, ¶ 1, 208 P.3d 926.

**32.** Title *15 O.S. Supp.2011 § 752* providing in pertinent part:

**33.** M. Evans, "Who is a 'consumer' entitled to protection of state deceptive trade practice and consumer protection acts," 63 A.L.R.5th 1 (1998). See also, *Law Offices of William J. Stogsdill v. Cragin Federal Bank for Sav.*, 268 Ill.App.3d 433, 206 Ill.Dec. 559, 645 N.E.2d 564, 63 A.L.R.5th 777 (1995).

¶ 27 *Lumber 2*, like the contract growers here, also sought to rely upon the term "consumer transaction" to characterize itself as a "consumer" entitled to the protections of the Act. It argued that because businesses were "persons" and "consumer transactions" included purposes which are "consumer transactions," it qualified as a "consumer." The growers' arguments here are no more persuasive than those that were presented in *Lumber 2*.

¶ 28 Applying rules of construction to the statutory scheme, in *Lumber 2*, we noted that the title of the Act provided that it related to "consumer protection" and that its protection extended to "buyers." [34] This led to the ultimate conclusion that the Consumer Protection Act extended to **buyers only when they were also "consumers."** Because the term "consumer" was not legislatively defined, we turned to plain and ordinary meanings of the term **focusing on definitions related to the use of purchased goods.** The Court noted that claims against violators of the Consumer Protection Act were available to "aggrieved consumers." [35] Although the retailer in *Lumber 2* had attempted to **purchase for resale** the welders,

we determined that, under the facts presented, it was not a "consumer" within the meaning of the Consumer Protection Act.

¶ 29 The growers here are in an even less tenable position to assert application of the Consumer Protection Act to their relationship with Tyson. The contracted growers purchase nothing. Title to the flocks, the food [36] the fowl eat, and any medicine provided rests with Tyson. They also sell nothing. Once the flock matures, they are paid based on how much feed it took for the chickens to gain the poundage put on during the time they were under the care of the contract growers. The contracts entered into between the poultry growers and Tyson were nothing more than service contracts, [37] in which the growers contracted to raise birds to maturity. Therefore, we hold that the contract growers are not "aggrieved consumers" entitled to the protections of the Oklahoma Consumer Protection Act. [38]

## CONCLUSION

¶ 30 We realize the amount of effort put into this litigation by the bench, the bar, and the litigants. However, it goes

---

**34.** Title 15 O.S.2011 § 751 providing in pertinent part:
"An Act relating to **consumer protection;** providing for **protection to buyers** against fraud and certain other practices **by sellers** ..." [Emphasis provided.]
See also, for the same proposition, *Melvin v. Nationwide Debt Recovery, Inc.*, 2000 WL 33950122 (W.D.Okla.2000).

**35.** Title 15 O.S.2001 § 761.1 providing in pertinent part:
"A. The commission of any act or practice declared to be a violation of the Consumer Protection Act shall render the violator liable to the **aggrieved consumer** for the payment of actual damages sustained by the customer and costs of litigation including reasonable attorney's fees, and the **aggrieved consumer** shall have a private right of action for damages, including but not limited to costs and attorney's fees...." [Emphasis provided.]
*Patterson v. Beall*, 2000 OK 92, ¶ 31, 19 P.3d 839 [The above quoted section gives a private right of action only to "an aggrieved consumer."].

**36.** Growers assert that they are essentially "purchasers" of the food given to the fowls, as it is "consumed" in the growing process. We left the issue open in *Lumber 2, Inc. v. Illinois Tool Works, Inc.*, 2011 OK 74, ¶ 21, 261 P.3d 1143 as

to whether a corporate entity might also be a consumer under appropriate facts. Today, we note that in *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569 (7th Cir.2004), the federal court determined that a business purchaser was not a "consumer" where the only use of a purchased product was as input into the making of a product sold.

**37.** *Bunting v. Perdue, Inc.*, see note 1, supra.

**38.** Our holding makes it unnecessary to consider whether the contracts might also be regulated under the 1921 Packers and Stockyards Act, 7 U.S.C. § 181 *et seq.* prohibiting unfair, unjustly discriminatory or deceptive practices or devises with respect to live poultry and thus be exempt from the Consumer Protection Act pursuant to 15 O.S.2011 § 752 providing in pertinent part:
"Nothing in this act shall apply to:
... 2. Actions or transactions regulated under laws administered by the Corporation Commission or any other regulatory body or official acting under statutory authority of this state or the United States, or to acts done by retailers or other persons acting in good faith on the basis of information or matter supplied by others and without knowledge of the deceptive character of such information or matter."

without saying that any party to an action is entitled to have the case heard by fair, impartial, and disinterested jurors. Furthermore, a juror's concealment, whether intentional or accidental, of information pertinent to prejudice or bias, coupled with the parties' inability to question the jurors on relevant issues is sufficient to warrant a new trial.[39]

¶ 31 Finally, statutes are not empty vessels into which we may pour a vintage better suiting our tastes.[40] Simply, the contract growers' claims are not embraced by the language referring to "aggrieved consumers" in the Oklahoma Consumer Protection Act. The contracts negotiated between the growers and Tyson were service contracts in which the growers contracted to raise birds, owned by Tyson on food supplied by the same company, for their later sale by Tyson to the consuming public. Under the facts presented, where there was substantial juror misconduct which the attorneys were effectively barred from investigating and where the growers may not afford themselves of relief under the Consumer Protection Act, we are constrained to remand the cause for a new trial.

### REVERSED AND REMANDED WITH INSTRUCTIONS.

TAYLOR, C.J., COLBERT, V.C.J., KAUGER, WATT, REIF, and GURICH, JJ., concur.

WINCHESTER, J., concurs in result.

COMBS, J., concurs by reason of stare decisis.

EDMONDSON, J., recused.

---

39. *Dominion Bank of Middle Tenn. v. Masterson,* see note 11, supra.

---

40. *National Broiler Marketing Ass'n v. United States,* see note 3, supra; *United States v. Sisson,* 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970).