2011 OK 104

**Charles WEST, Personal Representative of the Estate of Angela Schreiner, Deceased, Plaintiff/Appellee,**

v.

**BOARD OF COUNTY COMMISSIONERS OF PAWNEE COUNTY, Defendant/Appellant.**

**No. 108,960.**

Supreme Court of Oklahoma.

Dec. 20, 2011.

Rehearing Denied Feb. 23, 2012.

**32**

Derek S.A. Lawrence, Derek S.A. Lawrence, PLLC, Tulsa, Oklahoma, for plaintiff/appellee.

Eric D. Cotton, Collins, Zorn, & Wagner, P.C., Oklahoma City, Oklahoma, for defendant/appellant.

WATT, J.:

¶ 1 We granted certiorari for the sole purpose of determining whether the trial court erred in granting a motion for new trial where the jury awarded damages of $13,663.00 in a wrongful death action to the estate of a mother leaving behind five minor children. In so doing, we emphasize that *Clark v. Bearden*, 1995 OK 71, 903 P.2d 309 supports the granting of a new trial where

the inadequacy or excessiveness of an award, in and of itself, evidences that the passion and partiality inhering in it are so clear as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous.

¶ 2 The jury heard evidence that at thirty-one (31) Schreiner was an exemplary mother to her five minor children and was working while pursuing a college degree in chemical engineering to better her children's lives when she suffered a horrific death by drowning. The panel was appraised not only of the children's loss of companionship with their mother but with each other through placement with different family members, some of the living arrangements being less desirable than others. Evidence was presented that $5,800.00 was expended for funeral expenses. Despite this largely uncontested evidence, the jury returned a verdict in the estate's favor of only $13,663.00. The meager award, in and of itself, evidences that the passion and partiality inhering in it are so clear as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous. Under these facts, we determine that the trial court did not err in ordering a new trial to address the issue of damages.

## FACTS AND PROCEDURAL HISTORY

¶ 3 On the evening of May 7, 1999, Schreiner said "good night" to her five (5) children and left to visit a friend in rural Pawnee County. She was thirty-one (31) at the time. Schreiner took Cemetery Road, a portion of which floods on a regular basis. On the day of the accident, there were signs in place warning of high water and indicating the road was closed to through traffic. Arguably, Schreiner ignored the signs and drove over a hill into approximately twelve (12) feet of water.

¶ 4 The forensic pathologist who examined Schreiner's body and conducted the autopsy testified that the external and internal examinations indicated death by drowning.[1] He

---

1. Transcript of Jury Trial, April 5 to 7, 2010, Ronald F. Distefano testifying in pertinent part at p. 214:

"... Q. Do you have an opinion on the cause of Angie Schreiner's death, Doctor?
A. Yes, I do.
Q. And what is that opinion?

also noted the manner of bruising and the large number of contusions on her legs along with superficial injuries to her hands, including a broken nail and other abrasions, and significant bruising to the left hand.[2] He ordered a complete toxicology screen which returned negative for drugs or alcohol.[3] In addition, the pathologist opined that: nothing was revealed in the autopsy to indicate that Schreiner was not conscious when the car hit the water and began to sink; she likely struggled to escape the vehicle and that the contusions and injuries to the body occurred during the fight to survive; and for some period, while the vehicle was sinking and the driver was conscious, the mother experienced pain and suffering.[4]

> A. In my opinion she died of drowning...."

2. Transcript of Jury Trial, April 5 to 7, 2010, Ronald F. Distefano testifying in pertinent part at pp. 206–08:

> "... Q. ... Would you please describe what your observations were during Angie Schreiner's autopsy, please?
> A. ... Then, with respect to looking at her body externally, I noted that there were multiple superficial skin injuries that were present. Now, this was predominantly on her legs, so what I am talking about here essentially are on the legs, contusions that can be thought of as a bruise.... She had quite, quite a number of bruises on her legs.... She also had some superficial injuries, skin injuries on her hands. For example, on her right hand and on the middle finger, the tip of the nail was partially torn. On the palmer surface of the right hand she had a number of very small linear abrasions that I described as sharp to semi-sharp.... And then similarly on her left hand, here on the palmer surface of the left hand and over the base of the second finger, base of the third finger, base of the fifth finger, again just some tiny you can think of them as scratches. I just mean the very superficial scratch on the skin. On the back of her left hand there was bruising really over the surface of the back of all four of the fingers. So she had multiple superficial injuries on her hands and particularly on her legs...."

3. Transcript of Jury Trial, April 5 to 7, 2010, Ronald F. Distefano testifying in pertinent part at pp. 210–11:

> "... Q. Did you receive back a laboratory analysis of the samples you submitted for the testing?
> A. I believe, yes, I believe you mean the toxicology samples?
> Q. That's correct.... Okay. Would you relate the findings to the jury, please.
> A. The toxicology screen was negative. So, that means that they did not find drugs or alcohol in her blood...."

4. Transcript of Jury Trial, April 5 to 7, 2010, Ronald F. Distefano testifying in pertinent part at pp. 219–221:

> "... Q. (BY MR. LAWRENCE) Doctor, based on your examination of Mrs. Schreiner's body, did you find anything that would cause you to believe that Mrs. Schreiner was unconscious at the point that she went underwear [sic]?
> A. I did not....
> Q. (BY MR. LAWRENCE) Did you observe anything during the course of your autopsy that led you to believe that she was in fact not incapacitated?
> A. By incapacitated I assume we mean that she was unconscious?
> Q. That is correct....
> THE WITNESS: So based on the negative toxicology screen, I would conclude that she was not unconscious as [sic] result of any drug or other substance. Based on the lack of finding of any head injury that might render a person unconscious, likewise, there is no evidence to suggest that she was unconscious.
> Q. (BY MR. LAWRENCE) Did you during the course of your autopsy on Mrs. Schreiner come to a conclusion on whether Mrs. Schreiner attempted to extract herself from the vehicle?
> ... THE WITNESS: Based on the information that I got about the death and the findings in the autopsy, I think likely she did struggle to get out of the vehicle. In part that is a consideration that comes from what I would call common sense meaning that the scene was that of a flood [sic] roadway, a vehicle submerged in the water, and the person deceased inside the vehicle ... So, when the vehicle went into the water and the lacking any head injury or drug intoxication reason that she might have been unconscious, I believe that anyone would attempt to get out of the vehicle. The presence of superficial injuries on her body may or may not have been sustained in such an attempt to get out of the vehicle. But given the number of them and the character, I think it's more likely than not that some of them, if not most, happened that way.... And then it would take at least some finite amount of time, probably on the order of minutes for unconsciousness to occur because of being submerged....
> Q. Now, obviously, we can't—we don't know what went on in Angie Schreiner's head in the vehicle at the time that she was submerging into the water, but based on all of the facts and the situation that you've described today, would—do you have an opinion on whether or not an individual within the frame of work of what we have been discussing have suffered pain during the time it took up to until losing consciousness?
> ... THE WITNESS: Yes, I have an opinion.
> Q. (BY MR. LAWRENCE) Would you give that opinion to the jury, please?

¶ 5 At the time of her death, Schreiner had custody of all five of her children to whom she was an excellent mother.[5] She was working to support her children and was attending Tulsa University to further her education in an attempt to provide them with more economic stability.[6]

¶ 6 Despite Schreiner's ability to provide for her five children, there simply was no one at her death who could accommodate all of the siblings.[7] A family that had previously been a unit was broken up and parceled out to different homes. Three children went to live with their natural father. However, he was overwhelmed with the situation and one of the three moved in with her maternal grandfather. The two youngest children were placed with a great-aunt and uncle. Eventually, one of the children who had previously been living with his father was forced to move in with a grandmother because of allergies to cats in the father's home.[8] The

A. Well, based on what I said previous, I believe more likely than not there was some amount of pain and suffering that lasted in that limited time frame that it would have taken to first become unconscious and then subsequently drown. So during the time of consciousness, I would consider that pain and suffering. . . ."

5. Transcript of Jury Trial, April 5 to 7, 2010, Brandon Levi Schreiner testifying in pertinent part at pp. 157–58:
"... Q. Now, how old were you when your mom died:
A. I was 7 years old. . . .
Q. And once again could you remind the jury of your brothers and sisters' names. [sic]
A. There's Brittany Schreiner, she's my oldest sister. Brianna, she's the middle, Seth and Miranda are the two youngst [sic].
Q. Do you recall how old they were when your mom passed away?
A. Not really. Bit I think, I think Brianna was like four, Seth like three or two, and Miranda was one.
Q. Could you just generally describe the house that you were living in at the point in time that your mom passed away?
A. It was a great home. . . ."

6. Transcript of Jury Trial, April 5 to 7, 2010, Charles Thomas West testifying in pertinent part at pp. 124–25:
"... Q. Well, did—you observed her parenting skills; isn't that correct?
A. Yeah, she was a good parent. She loved those kids. I mean she took, you know, amazing to me how she could do all she did and still take good care of those kids. . . .
Q. Do you have any idea what her future plans were?
A. Well, she had been talking to—they have those career fairs in school and she had been talking to a number of petro chemical firms about employment opportunities. . . . That's, like I say, one of the reasons she went into chemical engineering because as opposed to some other kind of engineering because the level of pay is very good. And she would have been a professional chemical engineer within a matter of months and on her way to a career with one of those companies had she lived. . . ."

7. Transcript of Jury Trial, April 5 to 7, 2010, Charles Thomas West testifying in pertinent part at pp. 146–47:
"... Q. ... Let's talk about the family after the funeral. Do you recall how old Brittany was when her mom died?
A. Brittany was, would have been 11 years old or so.
Q. And after Angie dies what living arrangements were made for Brittany?
A. Brittany and Brandon, pardon me, Brittany and Brandon and Brianna all went to live with their father. But that didn't work out very well because it overwhelmed him, so I took Brianna, the middle one, and she moved in with me. Brittany and Brandon continued to live with their father and their grandmother in Sand Springs and Brianna continues to this day to live with me. The two little ones, Seth and Miranda went to live with Angie's aunt and uncle, Vicki and Richard O'Neal. And I fixed up, rehabbed Angie's house and sold it to Richard and Vicki for the cost to have them, so they would have a place to live and they moved in there. And that was the living arrangement, so the family was broken up because there wasn't anybody that was able to take care of all five children and it was just, that was simply the best way to do it. . . ."

8. Transcript of Jury Trial, April 5 to 7, 2010, Brandon Levi Schreiner testifying in pertinent part at p. 164–65:
"... Q. How long did you live with your father?
A. I lived with my father from after my mother died until seventh grade, which I was, after seventh grade, I was 14, so.
Q. Where did you move to after that?
A. After I lived with my father, I moved up to my grandmother's house which was right up the street.
Q. Why did you move in with your grandmother?
A. Well, mainly because, because my dad's house was, he had a lot of cats and I was very allergic to cats, I still am. And some other stuff that was, that was in the environment down there. I don't know what I was allergic to down there, it may have just dust [sic] or

child who originally lived in the father's home and moved in with the maternal grandfather described her father's home as "dysfunctional" and not well kept.[9] The separate households kept the children from developing normal sibling relationships.[10]

¶ 7 West filed the wrongful death action [11] on January 18, 2007 naming the Commissioners as defendants. The father alleged that his daughter's death arose as the direct result of the County's negligence in not closing the roadway when it became inundated with flood waters and/or failing to erect appropriate warning signs. After hearing evidence over a three (3) day period, the jury returned a verdict finding that: Schreiner was forty-three (43) percent negligent and that the County was fifty-seven (57) percent negligent. The jury awarded West $13,663.00 to be reduced by the trial judge by Schreiner's percentage of negligence making the actual cash award to the estate $7,787.91. When the $5,800.00 for burial expenses is subtracted from the monies actually received for Schreiner's wrongful death, **less than $2,000.00 remained for the support of five minor children.**

¶ 8 West filed a motion for new trial on April 16, 2008 alleging that the egregiously low value attributed to Schreiner's loss of life was inconsistent and contrary to the undisputed evidence and clearly in violation of 12 O.S.2001 § 651(4) [12] providing that a new trial is warranted if the damages awarded are so excessive or inadequate as to appear to

---

9. Transcript of Jury Trial, April 5 to 7, 2010, Brittany Rose Schreiner testifying in pertinent part at pp. 174–75:

"... something, but I always had puffy eyes and so my grandmother's house was just a better environment for me to be in...."

Q. Okay. What were your living arrangements after the funeral? I believe I understood both your grandfather and Brandon say that you moved in with your father as well—
A. Yes.
Q.—for a period of time? What was that like for you?
A. It was a big change of lifestyles.
Q. How so?
A. Well, it was a lot more dysfunctional. My mom cooked dinners every night, you know, every single night and my dad, it was just kind of, you know TV dinner style things and my dad didn't keep a clean house. And my stepmom didn't like us and I mean it was—
Q. You say she didn't like you. Do you have any reason for that perception or?
A. Well, she was always really mean to us. I remember a specific occasion when Brandon and I were really young and we were singing and she, and she tells us, she tells us, if you're going to sing, please sing on key, and we are like, we are children, you know. I mean she was always really just very cold to us...."

10. Transcript of Jury Trial, April 5 to 7, 2010, Brittany Rose Schreiner testifying in pertinent part at p. 178:

"... Q. Okay. And you state that you saw Brianna and Seth and Miranda much less after you became separated, did the relationship change your interactions between each other and your feelings?
A. Well, I actually still saw Brianna quite a bit because I went to my grandpa's after school but it was Seth and Miranda that I really lost contact with. And no. I mean we didn't, we never had much of a relationship like we should have because they were so young....
Q. Okay. Where was the last time you saw them?
A. Had to be at least a year ago...."

11. Title 12 O.S. § 1053 providing in pertinent part:

"A. When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter ...
B. The damages recoverable in actions for wrongful death as provided in this section shall include the following:
Medical and burial expenses ...
The mental pain and anguish suffered by the decedent ...
The pecuniary loss to the survivors based upon properly admissible evidence with regard thereto including, but not limited to, the age, occupation, earning capacity, health habits, and probable duration of the decedent's life ...
The grief and loss of companionship of the children and parents of the decedent ...."

12. Title 12 O.S.2001 § 651 providing in pertinent part:

"A new trial is a reexamination in the same court, of an issue of fact or of law or both, after a verdict by a jury, the approval of the report of a referee, or a decision by the court. The former verdict, report, or decision shall be vacated, and a new trial granted, on the application of the party aggrieved, for any of the following causes, affecting materially the substantial rights of the party:
... 4. Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice ...."

have been given under the influence of passion or prejudice.

¶ 9 On October 28, 2010, a hearing was held on the motion for new trial. The trial court granted a new trial based on a determination that the jury's monetary award for the loss of a human life was unconscionable and shocked the conscience. The Court of Civil Appeals reversed and remanded finding that the trial court applied the wrong standard in granting the new trial motion and that the jury's verdict was supported by the evidence. West filed a petition for certiorari on August 11, 2011. Having reviewed the petition and answer thereto, we granted certiorari on October 31, 2011.

### Standard of Review

¶ 10 It has long been recognized that the granting of a new trial is within the wide discretion of the trial court.[13] We will not reverse an order granting a new trial unless error is clearly established in respect to some pure, simple, and unmixed question of law.[14] The judge who presides at the trial: hears the testimony; observes the witnesses; and has full knowledge of the proceedings during the trial process. It is that adjudicator who is in the best position to know whether substantial justice has been done. Where such a judge sustains a motion for new trial, a clear showing of manifest error and an abuse of discretion must be made before this Court is justified in reversing the ruling. The threshold for upholding the grant of a new trial is much lower than where the motion is overruled.[15] Furthermore, when, as here, the new trial is granted by the same judge who tried the case, a much stronger showing of error or abuse of discretion is required for this Court to re-

verse than if a party appeals from a refusal to grant a new trial.[16]

¶ 11 The only issue upon which new trial was requested was for the determination of an adequate monetary award for Schneider's wrongful death. By sustaining the motion, the parties are placed in a position to have the damages issue again submitted to a jury or court.

¶ 12 **Under the facts presented, the trial court was justified in ordering a new trial to address damages. The award of only $13,663.00 in damages for the death of a thirty-one year old woman with the responsibility to support five minor children, in an of itself, evidences that the passion and partiality inhering in the award are so clear as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous.**

¶ 13 West argues that the jury essentially ignored testimony key to determining the appropriate damages award for his daughter's wrongful death, *i.e.* general damages such as pain and suffering, loss of companionship and love and affection suffered by the father and the children, and monetary support Schreiner would have contributed to her children. He asserts that the size of the award is demonstrative, in and of itself, of the jury's bias.

¶ 14 The County contends that Oklahoma jurisprudence prohibits sustaining the new trial motion based on a determination that the jury's monetary award for the loss of a human life was unconscionable and shocked the conscience.[17] Generally, we might be in

13. *Sligar v. Bartlett*, 1996 OK 144, ¶ 13, 916 P.2d 1383; *Propst v. Alexander*, 1995 OK 57, ¶ 8, 898 P.2d 141; *Austin v. Cockings*, 1994 OK 29, ¶¶ 9–10, 871 P.2d 33; *Rein v. Patton*, 1953 OK 117, ¶¶ 19–20, 257 P.2d 280; *Harper v. Pratt*, 1943 OK 281, ¶ 3, 141 P.2d 562.

14. *Rein v. Patton*, see note 13, supra; *Reyes v. Goss*, 1951 OK 215, ¶ 11, 235 P.2d 950.

15. *Rein v. Patton*, see note 13, supra; *Harper v. Pratt*, see note 13, supra.

16. *Sligar v. Bartlett*, see note 13, supra; *Propst v. Alexander*, see note 13, supra.

17. The County also claims that West may not now complain about the amount of damages awarded when he did not request a specific amount for: grief; loss of companionship; parental care, training, guidance, and education; or pain and suffering. These damages are general in nature and are elements which cannot be fixed with an exact amount. *Government Employees Ins. Co. v. Quine*, 2011 OK 88, fn. 2, 264 P.3d 1245. The ascertainment of such damages are such as may be awarded when there is no measure which can be identified, except the judgment and opinion of a reasonable person. *Hornstein v. Yarrington*, 1925 OK 440, ¶ 5, 237 P.

accord with the argument. Nevertheless, under the facts presented, we disagree as a matter of law.

¶ 15 The County finds support in *Clark v. Bearden*, 1995 OK 71, 903 P.2d 309. *Clark* concerned a medical malpractice claim associated with a colonoscopy performed on Clark at the age of seventy-five (75). Clark's colon was perforated during the procedure and a second surgery was required. At trial, the Clarks presented medical and hospital bills totaling $74,404.00. The charges related to the perforated colon amounted to approximately $33,500.00. Clark suffered a number of medical conditions following the initial surgery. Nevertheless, a medical expert testified that none of the subsequent conditions involving her sigmoid colon, treatment for respiratory problems, or a liver abscess had been caused by the perforated colon. The jury returned a verdict for $41,083.33, approximately $180.00 more than the difference between the damages claimed for both surgeries and the amount expended for the original surgery alone.

■ ¶ 16 The Clarks moved for new trial on grounds of the inadequacy of the verdict.

The trial court sustained the motion on grounds that "the inadequacy of the verdict is unreasonable and outrageous." We reversed, stating that: "[a] clear showing of prejudice is required before we will allow a trial court to set aside a jury verdict, or set it aside ourselves, for excessiveness or inadequacy of damages." We also overruled an early case, *Shreve v. Cornell*, 1938 OK 144, 77 P.2d 1 to the extent that it could be interpreted **to allow a trial court to substitute its own judgment for that of a jury as a matter of conscience where there is evidence in the record to support the jury's verdict, *and* there is no clear showing that the jury's verdict was unreasonable and outrageous beyond all reason.** However, in so doing, we did not "throw the baby out with the bath water." Even under *Clark*, the inadequacy or excessiveness of an award may justify a new trial where the passion and partiality inhering in it is so clear as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous.[18]

¶ 17 Today's cause is distinguishable both from *Clark*, and from the two cases it relied upon:[19] *Aldridge v. Patterson*, 1954 OK 264,

73. Proving the precise amount of such damages is, by their very nature, almost impossible. *Browning v. Ray*, 1968 OK 52, ¶ 13, 440 P.2d 721. Where it is plainly apparent from the injury alone that the injured person must of necessity undergo pain and suffering, the jury may infer that fact from the injury itself. *Blanke v. Alexander*, 152 F.3d 1224 (10th Cir.1998); *Edwards v. Chandler*, 1957 OK 45, ¶ 5, 308 P.2d 295. There is no absolute standard to measure damages. Even without demonstrating a loss of earnings, an award will be justified where the nature of the injury supports the same. *Lawton Transit Mix, Inc. v. Larson*, 1969 OK 83, ¶ 11, 455 P.2d 696. *See also, Ellis v. Gurich*, 2003 OK 47, 73 P.3d 860 [Order in which it was anticipated that there would be a request for an award for grief, loss of companionship, and the like, without the calling of an expert witness.]; *Johnson v. Hillcrest Health Ctr.*, 2003 OK 16, ¶ 13, 70 P.3d 811 [Expert testimony unnecessary when issue within the common knowledge of lay persons.]; *Stroud v. Arthur Andersen & Co.*, 2001 OK 76, ¶ 30, 37 P.3d 783 [Acknowledging that where damages could not be reduced to precise calculation, a range of damages could be submitted for consideration by the trier of fact].

18. *Clark v. Bearden*, 1995 OK 71, ¶ 7, 903 P.2d 309 providing in pertinent part:
  "... The inadequacy or excessiveness of an award, and the passion and partiality inhering

in it, must be so clear 'as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous.' *Park v. Security Bank and Trust Company*, 512 P.2d 113, 116 (Okla.1973), and *Fleming v. Baptist General Convention of Oklahoma*, 742 P.2d 1087, 1098 (Okla.1987), both quoting from *Austin Bridge Co. v. Christian*, 446 P.2d 46, 49 (Okla. 1968)...." [Italics in original.]

19. The Commissioners also rely on *Dodson v. Henderson Properties*, 1985 OK 71, 708 P.2d 1064, discussed in *Clark v. Bearden*, see note 18, supra. In addition, they cite to *Battles v. Janzen*, 1958 OK 94, 325 P.2d 444 in which the grant of a new trial was denied and affirmed by this Court. Just as *Clark* and *Dodson*, are distinguishable from the situation presented here, so is *Battles*, this note, supra. In *Battles*, the request for a new trial was for out of pocket expenses accrued because of treatment for injuries sustained in a car accident. In that case, we found that the doctor's testimony "estimating" his bill was insufficient to overturn the jury's verdict. The issue in *Battles* was whether the award of special damages was sufficient. Economic or special damages are defined as those which can either be assigned an exact dollar figure or calculated with reasonable mathematical certainty. Here, pain and suffering, are non-economic or general damages. Such damages cannot be

276 P.2d 202 and *Dodson v. Henderson Properties, Inc.*, 1985 OK 71, 708 P.2d 1064. In *Aldridge*, the parents of a ten-year-old boy brought suit for wrongful death. Although the parents sought $16,955.65 in damages, the jury returned a verdict for only $750.00. We reversed the trial court's grant of a new trial, in part, because there was evidence to support the verdict.

¶ 18 The *Aldridge* Court noted that the $750.00 award was a paltry sum. Nevertheless, it upheld the award where it exceeded the liquidated damages by some $300.00. Nevertheless, today's cause differs materially from the one presented in *Aldridge*. There the issue was what contributions the "dead child might have made to his parents' support"—a situation where no legal duty exists.[20] Here, **the question is what would have been the mother's support of her five children—a legal duty from which the mother would not have been relieved until all her children reached majority[21] and in which the law implies substantial damages to the minor children by reason of the mother's death.[22]** In such a case, the law will imply a substantial loss to the minor child of a deceased regardless of whether the deceased had supported or intended to support the minor child. Here, there was evidence not only that Schreiner was supporting her children but also that she was doing her best to increase her income to a level which would have improved the children's economic position.

¶ 19 *Dodson v. Henderson Properties, Inc.*, 1985 OK 71, 708 P.2d 1064 was a swimmer's suit to recover for damages sustained upon diving into an apartment complex swimming pool. Dodson presented evidence of economic damages of $3,409,120.77 and requested another $1,401,600.00 for pain and suffering. After an award of $3,000,000.00 in the swimmer's favor, the trial court granted the apartment complex owner's motion for new trial by reason of the swimmer's refusal to agree to remittitur. This Court reversed noting that "[i]f the damages were unsupported by the evidence, then there might be some basis for concluding that in some manner or another, the jury was prejudiced against the defendant."

¶ 20 Expert testimony is not necessary if the element of damage lies within the common knowledge of lay persons.[23] No expert testimony was submitted regarding the mother's potential earning power. Nevertheless, West did testify that he expected his daughter would have earned a degree in chemical engineering within a matter of months had her life not ended so tragically. In closing, West's counsel presented the jury with a scenario in which it was explained that earning a minimum of $10.00 per hour once the mother completed her education in chemical engineering she could have expected an approximate income of $192,000.00 over ten years.[24] In 1999, when the mother was killed, the minimum wage was $5.15. If that rate had stayed in effect, the mother could have expected to earn approximately $107,120.00 over the same period without a college degree. On the date of trial, the minimum wage was $7.25. Were the jury to have taken that amount into consideration and applied it over a ten year period, the total would have been approximately $150,800.00.[25] There simply is no rational

---

fixed with an exact monetary amount. *Government Employees Ins. Co. v. Quine*, 2011 OK 88, fn. 2, 264 P.3d 1245. See also, *Browning v. Ray*, 1968 OK 52, ¶ 13, 440 P.2d 721. Furthermore, just the nature of an injury may support an award of general damages without demonstrating the amount of the loss incurred. See, *Lawton Transit Mix, Inc. v. Larson*, 1969 OK 83, ¶ 11, 455 P.2d 696; *Venable v. Burton*, 1961 OK 132, ¶ 12, 363 P.2d 224.

20. *Boatright v. Perkins*, 1995 OK 34, ¶ 9, 894 P.2d 1091.

21. *Shull v. Reid*, 2011 OK 72, ¶ 7, 258 P.3d 521; *Holleyman v. Holleyman*, 2003 OK 48, ¶ 7, 78 P.3d 921; *State ex rel. Dept. of Human Services v. Baggett*, 1999 OK 68, ¶ 22, 990 P.2d 235.

22. *Belford v. Allen*, 1938 OK 335, ¶ 0, 80 P.2d 671; *Tackett v. Tackett*, 1935 OK 907, ¶ 0, 50 P.2d 293.

23. See, *Johnson v. Hillcrest Health Center, Inc.*, 2003 OK 16, ¶ 13, 70 P.3d 811.

24. This characterization is low if you consider $10.00 times 40 hours per week times 52 weeks times 10 years which would total $208,000.00.

25. The totals reached in the minimum wage scenarios are estimated by utilizing the same formu-

basis upon which the jury's award of only $13,663.00 can be sustained. The size of the award itself clearly demonstrates the panel's passion and prejudice.

¶ 21 *Clark* does not prohibit granting a new trial where the inadequacy or excessiveness of an award, in and of itself, evidences that the passion and partiality inhering in it are so clear as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous. The jury awarded West $13,663.00, approximately $5,800.00 of which were for funeral expenses. No individual, trial judge, or member of this Court looking at an award limiting a mother's ability to support five children to approximately $8,000.00 over a period of ten years can say that the award was not "beyond all measure unreasonable and outrageous." The verdict, being so grossly inadequate, makes it clear that the jury was guided by considerations other than the evidence, *i.e.* passion or impartiality. Therefore, we determine that the trial court did not err in ordering a new trial to address the damages issue.[26]

## CONCLUSION

¶ 22 The trial judge was present during the trial, observed the witnesses, and heard their testimony. There was largely undisputed evidence of Schreiner's pain and suffering prior to drowning, the loss of companionship and love suffered both by her father and her children, and of her attempts to meet a legal and moral duty to support her children to majority had she lived. After hearing argument from the parties' counsel, the trial court determined that the jury's award of $13,663.00 for the loss of Schreiner's young life was unconscionable and shocked the conscience. On the record presented, there has been no clear showing of manifest error and an abuse of discretion. The County simply has not met the difficult standard which must be demonstrated to show that the trial court erred in granting a new trial. Therefore, the trial court's new trial order must be upheld. The order of trial court is affirmed and the matter is remanded for a new trial as ordered below.

## CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS' OPINION VACATED; TRIAL COURT AFFIRMED AND CAUSE REMANDED.

COLBERT, V.C.J., WATT, EDMONDSON, REIF, COMBS, GURICH, JJ., concur.

KAUGER, J., concurs in part, dissents in part.

TAYLOR, C.J. and WINCHESTER, J., dissent.

TAYLOR, C.J., dissenting

The uncontested facts are clear. This roadway was flooded. The Pawnee County Commissioners *closed* this road and placed 8 foot barricades with two signs warning that the road was closed due to high water. The Decedent ignored all this and proceeded

---

la presented in fn. 24, supra, utilizing figures for minimum wage from the United States Department of Labor. Web: *http://www.dol.gov/esa/whd/flsa/* and www.infoplease.com.

**26.** Under the facts presented, we determine that the inadequacy or excessiveness of the award, in and of itself, evidences that the passion and partiality inhering in it are so clear as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous. We also note, as West argued, that damages, in all cases, must be reasonable. Title 23 O.S.2001 § 97 providing:

"Damages must, in all cases, be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered."

Where the evidence presented indicates that a jury's award is grossly inadequate, the trial court does not abuse its discretion by setting aside the verdict and granting a new trial. An appellate court will affirm a correct judgment on any applicable theory. *Ethridge v. Neundorf*, 1955 OK 143, ¶ 0, 283 P.2d 834. *Nichols v. Nichols*, 2009 OK 43, fn. 14, 222 P.3d 1049; *Akin v. Missouri Pacific R. Co.*, 1998 OK 102, ¶ 35, 977 P.2d 1040; *Bivins v. State ex rel. Oklahoma Memorial Hosp.*, 1996 OK 5, fn. 40, 917 P.2d 456. If legally correct, a trial court's ruling will not be reversed because of its faulty reasoning, erroneous finding of fact, or its consideration of an immaterial issue. *Willis v. Nowata Land & Cattle Co.*, 1989 OK 169, ¶ 13, 789 P.2d 1282; *Davidson v. Gregory*, 1989 OK 87, fn. 23, 780 P.2d 679; *Utica Nat'l Bank & Trust Co. v. Associated Producers Co.*, 1980 OK 172, ¶ 20, 622 P.2d 1061.

around the large barricade and warning signs and drove into 12 foot deep water and unfortunately died as a result of her own negligence. The highly-charged emotional evidence presented by the Plaintiff somehow moved the jury to assess some liability and damages upon the County. The Plaintiff now wants more money by way of a new trial *on damages only.* There is absolutely no legal basis upon which a new trial should have been granted. This jury was very generous under the evidence of this case. I agree with the analysis of the Court of Civil Appeals. There should be no new trial.