OSCN Found Document:ELLISON v. CAMPBELL

 
 
 
 OSCN navigation


 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 





 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 

 
 
 
 ELLISON v. CAMPBELL
2014 OK 15
326 P. 68
Case Number: 108468
Decided: 03/11/2014
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2014 OK 15, 326 P. 68

JACKIE EUGENE ELLISON, a/k/a GENE ELLISON, individually and as 
Trustee of the Equivalent Exemption Trust Created Pursuant to Article V, VII, 
and VIII of the Last Will and Testament of Glen G. Ellison, Deceased; MARCIA 
ELLISON, an individual; RICHARD M. HEALY, P.C., an Oklahoma Corporation; JAYNE 
JARNIGAN ROBERTSON, P.C., an Oklahoma Professional Corporation; and MICHAEL J. 
BLASCHKE, P.C., an Oklahoma Professional Corporation, 
Plaintiffs/Appellees,
v.
MICHAEL D. CAMPBELL, an individual, and M.D. 
CAMPBELL & ASSOCIATES, L.P., a Texas Limited Partnership, 
Defendants/Appellants.

CERTIORARI TO THE COURT OF CIVIL APPEALS, DIVISION 
IV

¶0 The plaintiffs/appellees, Jackie Eugene Ellison and Marcia Ellison 
(collectively, Ellisons/landowners) along with Richard M. Healy, P.C. (Healy), 
Jayne Jarnigan Robertson, P.C. (Robertson), and Michael J. Blascheke, P.C. 
(Blascheke), sued the defendants/appellants, Michael D. Campbell and M.D. 
Campbell & Associates, L.P. (collectively, Campbell/expert witness) , for 
breach of contract in Oklahoma County District Court. The plaintiffs/appellees 
alleged that Campbell failed to render a defensible expert opinion in underlying 
litigation in Canadian County, Oklahoma, and, thereafter, abandoned the task for 
which he was hired. Campbell counterclaimed for $34,758.50, characterized as 
uncompensated professional services. An Oklahoma County jury rendered judgment 
in the plaintiffs/appellees' favor. Based on the jury's verdict, the trial court 
entered judgment for the plaintiffs/appellees for $408,748.68, plus statutory 
interest. Campbell filed a motion for new trial or, in the alternative, a motion 
for judgment notwithstanding the verdict. After hearing argument, the trial 
court overruled the motions and Campbell appealed. The Court of Civil Appeals 
reversed, finding that the breach of contract cause of action failed because the 
plaintiffs/appellees did not prove their cause by presenting an expert witness. 
Here, the expert witness indicted his own performance in the underlying matter. 
Supporting testimony made it clear that Campbell did not produce a document 
which accurately represented the state of the groundwater underlying the 
Ellisons' property or the source of its pollution. Any lay person could consider 
the testimony presented and conclude that the Ellisons did not receive the 
services for which they contracted. The expert witness's testimony was such that 
any reasonable juror might question his candidness. Under these unique facts, it 
was unnecessary for plaintiffs/appellees to rely upon expert testimony to 
prevail in their breach of contract claim.

COURT OF CIVIL APPEALS OPINION VACATED;
TRIAL COURT 
AFFIRMED.

Jayne Jarnigan Robertson, JAYNE JARNIGAN ROBERTSON, P.C., Oklahoma City, 
Oklahoma, for plaintiffs/appellees, Michael J. Blaschke, P.C., Jackie Eugene 
Ellison, Marcia Ellison, Richard M. Healy, Jayne Jarnigan Robertson, 
P.C.
Andrew E. Karim, KARIM LAW OFFICE, Oklahoma City, Oklahoma, for 
defendants/appellants, Michael E. Campbell, M.D. Campbell & Associates, 
L.P.


WATT, J.:
¶1 We granted certiorari to consider a single issue.[1] The first impression question 
presented is: whether, in a suit for breach of contract in which a party seeks 
compensation for an expert witness's failure to provide competent litigation 
support services in an underlying suit, the cause must be proven by the 
presentation of expert testimony.
¶2 We emphasize that this matter is grounded on a claim for breach of 
contract. In so doing, we also stress that this opinion does not stand for the 
proposition that a losing party may recover monies paid to an expert witness for 
the formulation and presentation of a professional opinion in the context of 
litigation merely because the party requesting such opinion did not prevail or 
recover to the extent anticipated. Nevertheless, we determine that, under the 
unique facts of this cause, expert testimony demonstrating that Campbell's 
performance in the underlying litigation was substandard was unnecessary. 
Campbell's own admissions were sufficient to infer negligence. Furthermore, 
there was additional, supporting testimony indicating that Campbell did not 
present an accurate document which could be empirically supported or shown to 
comply with governmental standards. The testimony presented was most certainly 
such that a lay person, through common knowledge or experience, could determine 
that Campbell did not produce the very thing for which the Ellisons' contracted, 
a supportable expert opinion concerning the state of the groundwater underlying 
the Ellisons' property and the source of its pollution.[2] Finally, Campbell's contradictory 
statements made at the time of his deposition and at trial were sufficient that 
a reasonable juror might well question his veracity.
FACTS AND PROCEDURAL HISTORY
¶2 On April 29, 1999, the Ellisons filed suit in Canadian County against an 
oilfield waste disposal facility alleging it was responsible for polluting the 
groundwater on their property. The Ellisons believed that the polluted ground 
water explained the deaths of cattle grazing on their property and drinking from 
its streams. They hired Campbell, an expert hydrogeologist,[3] in January of 2001 to conduct 
tests and to drill monitoring wells to establish empirical data which would 
allow him to render a scientifically supportable expert opinion to confirm their 
suspicions and provide support for their suit.
¶3 Campbell recommended that several monitoring wells be drilled on the 
Ellisons' property to provide groundwater samples for pollution measurements. In 
an attempt to control litigation costs, the Ellisons agreed to the drilling of 
two monitoring wells. Samples were collected from the wells for a period 
of several years while a partial summary judgment in the cause was considered on 
appeal. At the request of the Ellisons, Campbell prepared his expert report and 
presented it to the defendants in the Canadian County cause in September of 
2006.
¶4 On December 4, 2006, Campbell appeared for his deposition. The defendants 
grilled the expert witness over a three-day period. During that time, Campbell 
testified that he did not know whether certain protocols were followed in sample 
testing.[4] He 
also pointed out errors in the report he submitted to the defense prior to his 
deposition, including the utilization of a value of 4,000 cubic feet in a 
calculation when it should have been 8,000 cubic feet.[5] When asked if he thoroughly researched 
industry knowledge in regard to mud pits and their relationship to leakage and 
pollution, Campbell responded that it was "difficult to say" and that 
"serendipity has a lot to do with finding articles when you need them."[6]
¶5 At the end of the first day of his deposition testimony, Campbell was 
asked to verify some of his calculations and to check errors in his written 
report. When asked about these items the next morning, Campbell told counsel: he 
"was too tired" to go over his report; he was "a busy person;" he knew the 
report contained misplaced bars on graphs, questionable concentrations, and the 
only way to be certain that all the charts in his materials were not riddled 
with errors would be to go back and look at them.[7] Initially, when asked if the 
monitoring wells complied with Oklahoma Water Resources Board and Environmental 
Protection Act standards, Campbell testified he "didn't know" because he hadn't 
read them and that the Environmental Protection Agency would not accept his data 
as reliable.[8]
¶6 Shortly after Campbell's deposition concluded on December 6, 2006, 
Campbell discontinued his assistance in the Canadian County litigation. While 
Campbell insists this occurred because he was fired, the Ellisons contend 
Campbell quit. The plaintiffs/appellees' allegation was supported by testimony 
presented at trial.[9]
¶7 The Ellisons settled the Canadian County matter in January of 2007. In 
July of the same year, they filed their petition in Oklahoma County in the 
instant cause alleging negligence, tortious breach of contract, and breach of 
contract for the expert witness's failure to provide them with a scientifically 
supportable product which could be utilized in the Canadian County suit. The 
Ellisons sought actual and consequential damages. Campbell moved to dismiss the 
cause arguing that the Ellisons had not stated a claim upon which relief could 
be granted and that the claim sounded in contract rather than in tort. The trial 
court agreed in part, finding that the Ellisons' cause should proceed as a 
simple breach of contract case. Campbell counterclaimed arguing that he was owed 
some $34,758.50 for services rendered, together with prejudgment interest, 
reasonable attorney's fees, and costs.
¶8 The jury heard testimony in the instant cause over a four-day period, 
February 8th through the 11th, 2010. On March 11, 2010, based on the jury's 
verdict in the Ellisons' favor, the trial court entered judgment for the 
plaintiffs/appellees in the sum of $408,748.68,[10] plus statutory interest. Campbell 
timely filed a motion for new trial or, in the alternative, a motion for 
judgment notwithstanding the verdict. Campbell argued that the Ellisons' claim 
for breach of contract failed because they did not present an expert in 
hydrogeology to counter his scientific conclusions. Unconvinced, the trial court 
denied the motions.
¶9 Campbell appealed. In an unpublished opinion, the Court of Civil Appeals 
reversed the trial court on September 6, 2013. It determined that the trial 
court committed error by failing to require the Ellisons to present an expert to 
refute Campbell's testimony for the purpose of establishing that his actions in 
the underlying cause amounted to a breach of contract.
¶10 On September 26, 2013, the Ellisons filed their petition for certiorari 
with this Court. The petition was granted on December 3, 2013. We received the 
record on the 9th. On January 6, 2014, a new attorney filed an entry of 
appearance on Campbell's behalf.
Standard of Review
a) Denial of new trial.
¶11 Upon review of a motion for a new trial where the trial judge presided at 
the trial, heard the testimony, observed the witnesses, and had full knowledge 
of the proceedings, it is well settled that our standard of review is one of 
abuse of discretion.[11] This Court recognizes that the original 
adjudicator is in the best position to know whether substantial justice has been 
done.[12] 
The strength of the showing for error or abuse of discretion is much less 
when the trial court refuses to grant a new trial than when such a motion is 
sustained.[13]
b) Judgment notwithstanding the verdict.
¶12 In ruling on a motion for judgment notwithstanding the verdict, the trial 
judge considers all evidence favorable to the nonmoving party and disregards all 
evidence favorable to the movant. We apply the same standard on review of the 
trial judge's decision.[14]
c) Jury Verdict.
¶13 We must affirm a jury verdict if there is any competent evidence 
reasonably tending to support it, evidence which is relevant and material to the 
issue to be determined.[15] It is not for us to weigh the evidence. We 
consider all the evidence tending to support the verdict, together with every 
reasonable inference from it. We must affirm unless there is an entire 
absence of proof on a material issue.[16] A jury verdict is conclusive 
as to all disputed facts and all conflicting statements, where there is any 
competent evidence tending to support the jury verdict. Where a jury has tried a 
cause, it is the exclusive arbiter of the credibility of the witnesses.[17]
d) Necessity of producing expert testimony.
¶14 Expert testimony is ordinarily necessary to establish causation in 
professional negligence cases.[18] Nevertheless, an expert is not required if the 
element of damage lies within the common knowledge of lay persons.[19]
¶15 Campbell's admissions were sufficient to demonstrate 
his
substandard performance in preparing expert materials
in 
the underlying litigation. Additional testimony confirmed
that 
Campbell did not prepare an accurate document which could 
be
empirically supported or shown to comply with 
governmental
standards. Campbell's contradictory statements were 
sufficient to cause
a reasonable juror to question his veracity. Under 
these unique facts,
it was unnecessary for the Ellisons to present an 
expert witness.
The average, lay person could most certainly conclude 
that
Campbell had not performed the preparations 
necessary
to produce a viable product for the purpose of 
demonstrating
the existence and source of groundwater pollution 
in the Canadian County proceedings.
¶16 It is uncontested that Campbell and the Ellisons had an agreement for 
Campbell to provide hydrogeological services to support claims of pollution in 
the Canadian County litigation. Although Campbell prepared a report and gave his 
deposition in that cause, the Ellisons contend that he breached the contract by 
presenting an opinion which was scientifically unsupportable and of no benefit 
in the underlying suit. Campbell's primary argument is that the Ellisons were 
required to present an expert witness to refute his testimony and to establish 
that he breached the terms of his contract in the Canadian County litigation. 
Under the unique facts presented, we disagree with the expert witness's 
contentions.
¶17 The opposition in the Canadian County case took Campbell's pretrial 
deposition. Early on in the deposition, Campbell admitted that he did not know 
the reliability of some of his soil-testing results[20] and that his report contained a 
number of typographical errors. There was testimony that, after the deposition, 
Campbell admitted he would not pass a challenge at trial.[21] Again, Campbell 
vacillated on the stand and may have caused the jury to question his honesty 
concerning certain conversations that took place in the underlying cause, 
i.e.[22] Campbell admitted that he had been wrong when he 
initially testified that certain conversations did not take place.[23] There was 
also credible evidence that even before his deposition in the Canadian County 
matter was transcribed, Campbell quit without completing his contractual 
duties.[24]
¶18 At trial, the first witness called was Brad Gungoll (Gungoll), one of 
several attorneys representing the oilfield waste disposal facility in the 
Canadian County litigation. He testified that, in presenting an expert's report 
to laymen, one who had prepared a report which was attentive to detail was more 
likely to have credibility with the jurors than one which was riddled with 
typographic errors.[25] Gungoll went on to state that, in the Canadian 
County litigation, Campbell did not present himself as an expert "attentive to 
detail." The witness pointed out that: there were a number of typographical 
errors in the report; the expert witness was unable to back up the elements of 
his report; when Campbell's deposition was taken, the plaintiff's case was 
"basically over;" and Campbell essentially abandoned some aspects of his own 
report, making it impossible for the Ellisons to rehabilitate him as a credible 
witness.[26]
¶19 On cross-examination, Gungoll was asked to demonstrate where or how 
Campbell's report was deficient. In response, he pointed out that much of the 
expected background data was not collected and that it would be impossible to 
verify test results because water could not be drawn from the monitoring wells, 
perhaps because they were not properly completed.[27] Most notably, Gungoll stated that, 
by the time Campbell's deposition concluded, the Ellisons' case "for all intents 
and purposes, was in serious trouble"[28] and that there was nothing which could have 
been done to rehabilitate their witness.[29]
¶20 At least one of the attorneys in the underlying litigation testified that 
Campbell had admitted to him that he could not support the data contained in his 
reports[30] 
and that the information Campbell did ultimately present "was incredible, not to 
be believed."[31] The same individual stated that Campbell admitted 
not following the protocols set by the Environmental Protection Agency or the 
Oklahoma Water Resources Board in drilling the monitoring wells.[32] When Campbell was called 
to testify, he denied admitting that the wells had been "fouled up" but admitted 
remembering his deposition testimony essentially confirming that such was the 
case.[33]
¶21 The plaintiffs/appellees did not call an expert to testify concerning the 
opinions offered by Campbell as a hydrogeologist in the underlying cause. 
Nevertheless, the jury heard ample testimony, easily understood by any lay 
person, demonstrating the shortcomings in Campbell's work in the Canadian County 
litigation. Furthermore, Campbell's testimony, in and of itself, presents 
sufficient evidence from which the jury could have determined that the report he 
submitted was not what the Ellisons had bargained for when he was hired as an 
expert in the Canadian County matter. Finally, there was testimony confirming 
that even Campbell willingly acknowledged his own shortcomings in preparing the 
report for litigation purposes. Under these unique facts, it was unnecessary 
that the Ellisons present expert testimony by another hydrogeologist to counter 
Campbell's conclusions in the underlying litigation. Furthermore, we determine 
that the trial court did not abuse its discretion in denying the request for a 
new trial or judgment notwithstanding the verdict.
CONCLUSION
¶22 This opinion should not be read for the proposition that a losing party 
may recover monies paid to an expert witness for the formulation and 
presentation of an opinion in the context of litigation merely because the party 
requesting such opinion did not prevail or recover to the extent anticipated. 
Rather, here, we are faced with a unique set of circumstances. An individual 
held himself out as an expert in hydrogeology capable of preparing a 
scientifically supportable report in that field. He contracted with the Ellisons 
to prepare such a document and be available to support it with his testimony. 
Instead, he produced a report which was admittedly error-riddled and based upon 
methodologies not meeting either state or federal regulations. Simply, Campbell 
did not perform the services for which the Ellisons contracted and paid.
¶23 The cause was tried to a jury. It heard evidence competent to support its 
verdict. Whether we agree or disagree with the outcome is immaterial. It is not 
for this Court to second-guess such a verdict. Therefore, we affirm both the 
trial court's denial of a new trial and motion for judgment notwithstanding the 
verdict.

COURT OF CIVIL APPEALS OPINION VACATED;
TRIAL COURT 
AFFIRMED.

COLBERT, C.J., REIF, V.C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, TAYLOR, 
COMBS, JJ. - CONCUR
GURICH, J. - RECUSED

FOOTNOTES

[1] On 
appeal, Campbell made a number of additional arguments left unaddressed by the 
Court of Civil Appeals. Our resolution of the cause is dispositive of all issues 
related to allowing testimony of individuals Campbell categorizes as 
"non-experts" or involving alleged deficiencies in evidence because the 
plaintiffs did not present a scientific expert. Objections regarding Campbell's 
being allowed to either discover information from the resolution, dismissal, or 
settlement of the Canadian County suit or to allow presentation of the same 
during trial are unconvincing. When those events occurred, Campbell was no 
longer associated with the Ellisons or the Canadian County action. At the 
hearing on the motion for new trial, Campbell argued that the jury should have 
been informed "that the case was resolved on the [Ellison's] own terms." 
Transcript of Motion for New Trial, April 29, 2010, at pp. 5-6. As we have 
emphasized, the only issue in this cause is whether Campbell breached his 
contract with the Ellisons in the preparation of the report intended to be 
utilized in the underlying litigation. How the underlying tort claim was 
ultimately resolved has little or nothing to do with whether Campbell fulfilled 
his contractual obligations. No clear abuse of discretion being demonstrated in 
ruling on the exclusion, we leave it undisturbed. See, Bierman v. 
Aramark Refreshment Servs., Inc., 2008 OK 29, ¶17, 198 P.3d 877; Lerma v. 
Wal-Mart Stores, Inc., 2006 OK 84, ¶32, 148 P.3d 880; Myers v. 
Missouri Pacific R.R. Co., 2002 OK 60, ¶34, 52 P.3d 1014. Campbell also 
asserted that the trial court erred in allowing Robertson, a party and counsel 
for plaintiffs, to both testify as a witness and advocate before the jury. In 
Crussel v. Kirk, 1995 OK 
41, ¶¶11-12, 894 P.2d 1116, we 
made it clear that the predecessor to Rule 5.5, Rules of Professional Conduct, 5 
O.S. 2011, Ch. 1, App. 3-A, did not render an advocate incompetent as a witness. 
Rather, it invested the trial court with discretion to determine whether that 
advocate might testify. In Crussel, and here, the testifying attorney did 
not act as an advocate at trial, present arguments, or examine witnesses. See, 
Transcript of Motion for New Trial, this note supra, comments of the trial judge 
at p. 12 which provide in pertinent part: ". . . [T]he fact that Robertson was a 
plaintiff but she is also a lawyer, I tried to make sure that this group was 
separated from their lawyer, except she sat as a representative and testified. . 
. . But I have always excluded the attorney from having a direct involvement in 
the trial of the case. On the other hand, I have allowed that attorney to be of 
assistance to the attorney they subsequently hired. . . .". Finally, Campbell's 
complaints about wanting to exclude a witness who was not called and any 
objections concerning instructions are groundless. Transcript of Motion for New 
Trial, the note supra, providing in pertinent part: ". . . THE COURT: Okay. I 
guess the thing about Cottingham that doesn't seem to make any sense to me, is 
he wasn't allowed to testify, so even if there was some issue about how they 
compensated for his time, he didn't testify anyway. MR. TOLSON: You do have a 
good point in that regard, Your Honor. . . .". Transcript for Motion for New 
Trial, this note supra, providing in pertinent part at p. 7: ". . . THE COURT: 
There was some discussion in the response that some of these - you didn't object 
to some of these instructions on the record. MR. TOLSON: I believe - at the end, 
that's correct, whenever the - we had your conclusion, I didn't make those 
objections . . .".

[2] 
West v. Board of County Comm'rs of 
Pawnee County, see note 19, infra. See also, Johnson v. 
Hillcrest Health Center, Inc., note 19, 
infra.

[3] 
Transcript of Proceedings, February 9, 2010, Michael D. Campbell testifying in 
pertinent part at p. 210:
". . . Q. Mr. Campbell, what is your profession or occupation?
A. I'm a professional hydrogeologist and geologist.
Q. And hydrogeology is what?
A. The study of groundwater. . . ."

[4] 
Deposition of Michael D. Campbell, December 4, 2006, providing in pertinent part 
at p. 17:
". . . Q You understand that there's a specific protocol in utilization of 
the Hach kit, do you not?
. . . THE WITNESS: Yes, there's always instructions as to how to use them, 
yes. Kits.
Q (By Mr. Cottingham) In regard to how the Hach kit was used at the FPC site, 
you don't know if that protocol was followed or not, do you?
A No. . . ."

[5] 
Deposition of Michael D. Campbell, December 4, 2006 providing in pertinent part 
at pp. 38-40:
". . . Q So is the report - is the report incorrect in that respect?
A That report - this report is incorrect in two places. One, in the cover 
page, and the other is in the section 1 - must be page 1.
Q All right.
A Secondly, I noticed, in rereading my rebuttal, that a typo occurs on page 
3, one, two, three, fourth line, middle of the line it says 4,000 cubic feet. 
That 4 should have been an 8. That's a typo.
Q (By Mr. Cottingham) That fly ash - and I know the load tickets that your 
referring to, that - correcting the report form 4,000 to 8,000 cubic feet - what 
percent of that is the total cubic feet of material in the FPC site?
A Don't know. . . .
Q Using those volumetric calculations then, what does 8,000 cubic feet of fly 
ash equate to in terms of percent of that volume?
A We'd have to get out that calculation and then we'd have to select which of 
the cases that I used and then do the division. . . .
Q But you were still willing to rely on that in terms of your affidavit?
A Yes, because it seemed to be reasonable in a general rule of thumb. . . 
."

[6] 
Deposition of Michael D. Campbell, December 4, 2006, providing in pertinent part 
at pp. 65-67.

[7] 
Id., providing in pertinent part at pp. 289-291.

[8] 
Id., December 4, 2006, providing in pertinent part at pp. 
322-330.

[9] 
Transcript of proceedings, February 10, 2010, Michael J. Blaschke testifying in 
pertinent part:
". . . Q. All right. Did there come a time after that deposition when you 
spoke with Mr. Campbell?
A. Yes, there was.
Q. And did he have some comment on what you should do with the case from that 
point forward with regards to him?
A. Well, in essence he quit and said he could not or would not help us 
anymore. . . ."

[10] The 
amount awarded was almost identical to the amount the Ellisons paid to Campbell 
($312,648.82) along with the amount they expended at his request for 
investigatory work ($105,663.33). [These two figures total 
$418,312.15.]

[11] 
James v. Tyson Foods, Inc., 2012 OK 21, ¶12, 292 P.3d 10; B-Star, 
Inc. v. Polyone Corp., 2005 OK 8, ¶13, 114 P.3d 1082; Head v. 
McCracken, 2004 OK 84, 
¶2, 102 P.3d 670; Evers 
v. FSF Overlake Associates, 2003 OK 53, ¶6, 77 P.3d 581.

[12] 
James v. Tyson Foods, Inc., see note 11, 
supra.

[13] 
James v. Tyson Foods, Inc., see note 11, supra; 
Head v. McCracken, see note 11, supra; Mooney v. 
Mooney, 2003 OK 51, ¶50, 
70 P.3d 872.

[14] 
Covel v. Rodriguez, 2012 OK 5, ¶11, 272 P.3d 705; Computer 
Publications, Inc. v. Welton, 2002 OK 50, ¶6, 49 P.3d 732.

[15] 
King v. Berryhill Fire Protection Dist., 2013 OK 76, ¶5, 311 P.3d 836; Covel v. 
Rodriguez, see note 14, supra.

[16] 
Covel v. Rodriguez, see note 14, supra.

[17] 
Florafax International, Inc. v. GTE Market 
Resources, Inc., 1997 
OK 7, ¶3, 933 P.2d 
282.

[18] 
See, Strubhart v. Perry Memorial Hosp., 1995 OK 10, ¶33, 903 P.2d 263; Boxberger v. 
Martin, 1976 OK 78, ¶14, 
552 P.2d 370.

[19] 
West v. Board of County Comm'rs of 
Pawnee County, 2011 OK 
104, ¶20, 273 P.3d 31. See 
also, Johnson v. Hillcrest Health Center, 
Inc., 2003 OK 16, ¶13, 70 P.3d 811.

[20] See 
notes 4-5, supra, quoting Deposition of Michael D. Campbell.

[21] 
Transcript of proceedings, February 11, 2010, Jayne Robertson testifying in 
pertinent part at p. 496:
"Q. What did you say?
A. I told [Campbell] that he would be very surprised if the Judge in Canadian 
County would allow his testimony to be presented. He responded that he felt the 
same, that he didn't think he would pass a challenge either. . . ."

[22] 
Transcript of proceedings, February 11, 2010, Jayne Robertson testifying in 
pertinent part at p. 496-97:
". . . Q. So anything that Mr. Campbell said in this regard about what 
happened after the deposition is not true; is that correct?
A. I'm saying there were many things that Mr. Campbell said that were not 
true.
Q. Mr. Campbell testified also that there was no such conversation with Mr. 
Blaschke along with what - as far as what Mr. Blaschke said in the notes that he 
said that nobody can read but he and his wife. Mr. Campbell testified that that 
conversation did not happen.
. . . A. But the phone records show otherwise. And I was also in the office 
when Mr. Blaschke was talking to him. . . ."

[23] 
Transcript of proceedings, February 11, 2010, Michael Campbell testifying in 
pertinent part at pp. 519-20:
". . . Q. Mr. Campbell, yesterday I had questioned you about whether there 
had been a telephone call between you and Mr. Blaschke. And you at the time had 
told the jury that absolutely not. Was that your testimony at the time?
A. Yes, that was my testimony at the time, yes.
Q. Is you testimony still the same?
A. No. And I'd like to explain. . . .
A. Thank you. After I testified that there was no conversation, when I got 
back to the table, I got to thinking that there's something not quite right 
there. And I remembered that in the past there was a conversation between Mr. 
Blaschke and I, and -- but I know generally what it was about. . . .
Q. The conversation that you did have with Mr. Blaschke, was it of the things 
that Mr. Blaschke said in his notes and read into the record when I was 
questioning him?
A. That's exactly what I was emphasizing, no, that conversation was not held. 
I remember it was something about Ms. Robertson being angry after the deposition 
about me, and just the general things of what's going to happen in the future. . 
. ."

[24] 
Transcript of proceedings, February 11, 2010, Jayne Robertson testifying in 
pertinent part at p. 516:
". . Q. Had Mr. Campbell already quit by the time the deposition was 
transcribed?
A. Shortly thereafter, yes. . . ."

[25] 
Transcript of Proceedings, February 8, 2010, Brad Gungoll testifying in 
pertinent part at p.58.

[26] 
Id., Brad Gungoll testifying in pertinent part at pp. 58-64.

[27] 
Transcript of proceedings, February 8, 2010, Brad Gungoll testifying in 
pertinent part at:
p.73: ". . . Q. I want to know sir, how you can sit here in front of these 
people and tell them what the right standards are, when you cannot even voice 
what it is that [Campbell] failed to do?
A. I didn't say I couldn't voice. I told you just the opposite. I said, I 
can't tell you chapter and verse where it is in that deposition or in that 
report, but I can also tell you that he didn't - he never delineated the plume, 
he never found background, he did a lot of the simple things to do in any 
pollution litigation, he never did. . . ."
p. 85: ". . . Q. Do you know if Mr. Campbell met those standards in this 
case?
A. I don't recall that detail whether or not he actually - I know some of 
these wells were completed in such a way there wasn't any water in them, or 
where he couldn't reproduce his tests. I don't know why. I don't know if that's 
the way they were completed. You certainly couldn't run three measures of water 
out of it before you tested if you can't get any water out of it. Whether or not 
that was just something he had to do or not, I don't know but I know that was 
something I can recall specifically that was a problem. . . ."

[28] 
Transcript of proceedings, February 8, 2010, Brad Gungoll testifying in 
pertinent part at p. 86.

[29] 
Id., February 8, 2010, Brad Gungoll testifying in pertinent part at p. 
90.

[30] 
Transcript of proceedings, February 9, 2010, Michael Blaschke testifying in 
pertinent part at p. 189:
". . . Q. Okay. And who made the determination in your mind that Mr. Campbell 
could not support his reports?
A. Well, collectively the three lawyers did, and then he did when he 
confirmed that to me. . . ."

[31] 
Transcript of proceedings, February 9, 2010, Michael Blaschke testifying in 
pertinent part at p. 192.

[32] 
Id., February 9, 2010, Michael Blaschke testifying in pertinent part at 
p. 209.

[33] 
Transcript of proceedings, February 9, 2010, Michael Campbell, when confronted 
with his prior deposition, testifying in pertinent part:
at pp. 258: ". . . Q. Well, let's read that. My question, 'After you realized 
that Mr. Alexander had fouled up the monitoring well in Canadian County, did you 
go back and check his other work?
Answer: Yeah, everything . . .'"
at p. 260: ". . . 'Question: You attempted to call [the driller] to discuss 
deficiencies in this well and he wouldn't respond to it?
Answer: That's correct.
Question: Did you tell him I need to talk to you about the deficiencies in 
this?
Answer: Yes. In this well. Yes [sic] I did. . . .'"





 Citationizer© Summary of Documents Citing This Document
Cite
 Name
 Level
 None Found.
Citationizer: Table of Authority
Cite
 Name
 Level
 Oklahoma Supreme Court Cases Cite
Name
Level 1997 OK 7, 933 P.2d 282, 68 OBJ 306, Florafax International, Inc. v. GTE Market Resources, Inc.
Discussed 2002 OK 50, 49 P.3d 732, COMPUTER PUBLICATIONS, INC. v. WELTON
Discussed 2002 OK 60, 52 P.3d 1014, MYERS v. MISSOURI PACIFIC RAILROAD CO.
Discussed 1995 OK 10, 903 P.2d 263, 66 OBJ 583, Strubhart v. Perry Memorial Hosp. Trust Authority
Discussed 1995 OK 41, 894 P.2d 1116, 66 OBJ 1422, Crussel v. Kirk
Discussed 2003 OK 51, 70 P.3d 872, MOONEY v. MOONEY
Discussed 2003 OK 53, 77 P.3d 581, EVERS v. FSF OVERLAKE ASSOCIATES
Discussed 2003 OK 16, 70 P.3d 811, JOHNSON v. HILLCREST HEALTH CENTER, INC.
Discussed 2004 OK 84, 102 P.3d 670, HEAD v. McCRACKEN
Discussed 2005 OK 8, 114 P.3d 1082, B-STAR, INC. v. POLYONE CORPORATION
Discussed 2006 OK 84, 148 P.3d 880, LERMA v. WAL-MART STORES, INC.
Discussed 2008 OK 29, 198 P.3d 877, BIERMAN v. ARAMARK REFRESHMENT SERVICES, INC.
Discussed 2011 OK 104, 273 P.3d 31, WEST v. BOARD OF COUNTY COMMISSIONERS OF PAWNEE COUNTY
Discussed 2012 OK 5, 272 P.3d 705, COVEL v. RODRIGUEZ
Discussed 2012 OK 21, 292 P.3d 10, JAMES v. TYSON FOODS, INC.
Discussed 2013 OK 76, 311 P.3d 836, KING v. BERRYHILL FIRE PROTECTION DISTRICT
Discussed 1976 OK 78, 552 P.2d 370, BOXBERGER v. MARTIN
Discussed